Lawrence E. **WILSON**, Warden, San Quentin Prison, Appellant,

v.

William A. **ANDERSON**, Appellee.

No. 20977.

United States Court of Appeals Ninth Circuit.

June 16, 1967.

Thomas C. Lynch, Atty. Gen., Albert W. Harris, Jr., Asst. Atty. Gen., Louise H. Renne, Robert R. Granucci, Deputy Attys. Gen., San Francisco, Cal., for appellant.

John H. Sears, San Francisco, Cal., for appellee.

Before MADDEN, Judge, Court of Claims, and DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

Anderson was convicted in California Superior Court of the crime of forgery, Cal.Pen.C. § 470. His conviction was affirmed by the California District Court of Appeal. He then sought release by habeas corpus in the United States District Court. Anderson was tried before the decision in Griffin v. State of California, 1965, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. The trial judge instructed the jury that it could consider Anderson's failure to testify and the prosecutor in his opening and closing arguments, referred to Anderson's failure to testify. Under *Griffin,* this was error, and the California District Court of Appeal so held. However, it also held that the error, as well as certain other errors, was harmless, and affirmed the judgment under the California "harmless error" rule, set out in Article VI, section 4½ of the California Constitution.[1]

The District Judge did not hold a hearing; the parties agreed that he need not. Instead, agreeing with the California Court that the *Griffin* rule had been violated, he concluded that the error required that the conviction be set aside, regardless of prejudice.[2] Anderson was ordered discharged, and his custodian, the Warden of San Quentin Prison, appeals. We reverse.

■■■■ While this case was pending here, the Supreme Court decided the case of Chapman v. State of California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. That case establishes three rules: (1) "[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not resulting in the automatic reversal of the conviction."[3]; (2) Any "harmless error" rule applied to the violation, by a state court, of a provision of the United States Constitution, must be judged by a federal standard; (386

---

1. "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

2. The District Judge, in his opinion, said: "This Court is satisfied that the 'harmless error' rule has no application to a denial of constitutional rights, particularly when the denials of such rights are numerous and cumulative as in the instant case.
"This Court should not and will not treat these cumulative denials of constitutional rights as one would homeopathic drugs, which though harmful when taken in large doses, yet when taken in small doses may produce a salutary effect. The denial of constitutional rights is a dangerous and harmful poison even in doses of homeopathic proportion."

3. In arriving at this conclusion, the Court also said: "We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We declined to adopt any such rule." [386 U.S. at 21–22, 87 S.Ct. p. 827.]

U.S. at 21, 87 S.Ct. p. 827) (3) "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at 24, 87 S.Ct. p. 828.) The court then proceeded to apply this test, and to reverse a conviction because of violation of the *Griffin* rule.

It is apparent from *Chapman* that the decision of the District Judge in this case is erroneous. There remains the question of whether we should remand with directions to apply the *Chapman* test, and enter a new order, or whether we should ourselves apply the *Chapman* test. We choose the latter course. *Chapman* makes it clear that this court, like the trial court, is to apply the test. "While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case." [4] (386 U.S. at 24, 87 S.Ct. p. 828.) In *Chapman*, the Supreme Court itself proceeded to apply the test. It held that the test was not met, and reversed the conviction. Ordinarily, the test must be applied to the state trial record. It is difficult for us to conceive of a case in which the reception of further evidence by the federal habeas corpus court in relation to this issue would be proper. The full state trial record is before us, and we proceed to apply the test to it.

That record reveals the following: Calvin H. Kernen testified that on April 29, 1964, Anderson appeared at Kernen's gasoline service station. He presented to Kernen a check for $196, drawn on the account of Paul Leroy Calvert, payable to the order of Michael Pittman, and bearing the signature of Irene Calvert. Anderson asked if Kernen would cash the check, which Anderson described as a payroll check, saying that he had been working for Calvert. Kernen knew that Anderson was the brother of a Jim An-derson, who had an account with Kernen, but did not know whether he was a half or whole brother, or whether his last name was also Anderson; he knew him only as "Willy." Kernen said that he did not have enough money on hand to cash the check. Anderson told Kernen to use the check to pay up his brother's account and to give Anderson the balance of the amount of the check in cash. Anderson then borrowed Kernen's pen and in Kernen's presence endorsed the check with the name of Michael Pittman. Kernen accepted the check and applied $112 to the brother's account and gave Anderson the balance ($84) in cash. Payment of the check was stopped, and it was returned by the bank to Kernen. Thereafter, Sergeant Sonberg, of the Eureka police check detail, was called. He showed Kernen a "mug shot" of Anderson, which Kernen identified. Sonberg brought Anderson to Kernen's service station, where Kernen identified him as the man who had cashed the check.

Sergeant Sonberg testified. He described the two identifications of Anderson by Kernen, and identified the mug shot of Anderson that he had showed Kernen. The mug shot was received in evidence, over objection. It bore the notations "a regular two-view mug shot, Sheriff's Office, Humboldt County, 61094" and "March 10, 1964." After Kernen's initial identification, Sonberg had obtained a warrant for Anderson's arrest, arrested him at McKinleyville, and brought him first to Kernen's station and then to jail at Eureka. This took about an hour. During the ride, Sonberg asked Anderson about the Calvert check. Anderson said he didn't know anything about it. Sonberg asked again. Anderson said he was in a bar, and a person came up to him and wanted to cash a check, so Anderson took the check to a service station, cashed it, and brought the money back to this other person, whom he did not know. Sonberg told Anderson that he had paid a bill at the service station. Anderson then said that he happened to have the amount of

---

4. Fahy v. State of Connecticut, 1963, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171.

money in his pocket, cashed the check for the unknown person in the bar, then went to the service station with the check, paid the bill and got the balance in cash. He denied that he endorsed the check. At Kernen's station, in Anderson's presence, Kernen said that Anderson had used Kernen's pen and endorsed the check in Kernen's presence. Anderson denied this. All of these conversations were received over the objection that they were hearsay, and no proper foundation was laid. No warnings of any kind were given by Sonberg. Anderson did not ask for a lawyer. When Anderson was booked, he was asked to fill out a handwriting exemplar form, and told that he did not have to. He did so, with his left hand, taking some 25 minutes. His writing was illegible. The form was received in evidence. Sonberg then asked Anderson if he would give a statement, on a tape recorder. Anderson said "what for?" No statement was given.

Irene Calvert testified that she was the wife of Paul Leroy Calvert, a trucker. She kept the books and made out the payroll checks. These were delivered to her husband to give to his drivers. One of these drivers was Michael Pittman. She identified the check in question as one she had drawn on April 25, a Saturday. She did not recognize the signature on the back of the check. About two days later, she and her husband searched for the check but could not find it. A few days before April 25, a man named Anderson had applied to her husband for a job. He returned on April 27, but he was never employed.

Paul Calvert confirmed his wife's testimony as to her duties, the preparation of the payroll checks, their delivery to him, and the employment of Pittman. Pittman was absent on the 25th, and Calvert left his check and one other on a clip board in the shop for the men to pick up. A day or two later, he and Pittman searched for the check, but could not find it. Anderson came to his place twice, once seeking work, and the second time, Monday the 27th, to try out as a driver.

He did drive a truck with Calvert, but was not hired. Calvert was not certain whether Pittman's check was missing on Sunday, Monday or Tuesday.

Michael Pittman testified that he was employed by Calvert, that he was absent on April 25, that he looked for his check on Sunday the 26th or Monday the 27th, along with Calvert, but could not find it. Shown the check in question, he said that he had not seen it before the preliminary hearing in the case, did not endorse it, and that the signature on the back was not his. He did not know Anderson, and had not given him or anyone else permission to sign his name to the check.

Robert B. Walden, a deputy sheriff, the lieutenant in charge of the Humboldt County jail, described the booking procedure at the jail. He identified a "booking slip" containing details about Anderson and signed by him, and a California driver's license taken from Anderson when he was booked. He also identified two other booking slips, signed by Anderson, on the occasion of an arrest two years before, one when he was booked and one when he left the jail. His testimony as to these was confirmed by that of the jailer, David A. Bell. Walden also identified a slip of paper, taken from Anderson, on which were written the home and shop telephone numbers of Calvert. (Calvert had testified that those were his numbers.) These documents were all received in evidence, but the portions of the booking slips of 1962 that showed a prior charge and conviction were obliterated.

Anderson did not take the stand, and no evidence was offered on his behalf.

The California District Court of Appeal held: (1) The receipt of the testimony of Sonberg about his conversation with Anderson was error under Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and People v. Dorado, 1965, 62 Cal.2d 338, 42 Cal. Rptr. 169, 398 P.2d 361; (2) Receipt of the mug shot was error; (3) The court's instruction concerning Anderson's failure to testify and the prosecutor's comment on it were error under *Griffin,*

supra. But it also held under the California standard, that there was no miscarriage of justice.

■ As to item 1, the court was in error, in sofar as it was applying federal constitutional law. Anderson's trial was on July 24, 1964. Thus the strict requirements of Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, do not apply. Johnson v. State of New Jersey, 1966, 384 U.S. 719, 721, 86 S.Ct. 1772, 16 L.Ed.2d 882. But the requirements of *Escobedo* do apply. However, the rule in that case, as construed in *Johnson,* was not violated here. Anderson did not ask for counsel. (See 384 U.S. 733, 734, 86 S.Ct. 1781.) Thus, for federal constitutional purposes, there was no error in receiving Sonberg's testimony about Anderson's statements. The second error found by the California court is not one of federal constitutional dimension. As to these errors, we consider that the federal courts are bound by the state court's determination that errors arising under state law, but not of a federal constitutional character, are not prejudicial. We are also, we think, bound by the state court's holding that the third error, which is one of federal constitutional dimension, does not require reversal under the state standard. The only question properly before us is does

the federal standard laid down in *Chapman,* require us to overturn the conviction. We hold that it does not.

In *Chapman,* the court laid great stress upon the extensive comment, by the prosecutor, upon the defendants' failure to testify. The appendix to the opinion of the court shows the extent of that comment, and its context. The case was one where the state sought to convict on a complex chain of circumstantial evidence. And the prosecutor, in commenting on that evidence and the inferences that could be drawn from it, emphasized and re-emphasized the failure to testify as supporting the inferences that he urged the jury to draw from each of a whole series of items of circumstantial evidence. See *Chapman,* supra, 386 U.S. 26–42, 87 S.Ct. 829–836.

The case before us is strikingly different. Here there was direct testimony as to the commission of the offense, and none to the contrary, except one minor item—Sonberg's testimony that Anderson denied that he endorsed the check. The jury could have acquitted only by rejecting substantially all of the prosecution's testimony, by bringing in a verdict in the teeth of the evidence. And the comments of counsel were as much directed to the failure of Anderson to offer any evidence as they were to his failure to take the stand.[5] The absence

---

5. The following are all of the prosecutor's comments that are even remotely relevant to the issue:

"Now, one other thing the Judge will instruct you—he told you—he touched on this when we were picking the jury: The defendant, as Mr. Anderson has done, in a criminal case, he doesn't have to take the stand. That's his choice. He can take the stand if he chooses. He doesn't have to. I can't call him to the stand; the Judge can't demand that he get on the stand. That's completely up to him. He is not required to, under our law, to testify.

"The Judge will also instruct you that the jury may consider that, because of his failure to testify, that if he had certain facts which would be expected to be within his knowledge, that he could explain or deny certain things, that the jury may consider this. In other words, by that I mean such as in this case, Mr. Ander-

son could have gotten on the stand and told you, 'No I didn't sign that,' or, 'I wasn't up to the Calverts and somebody else told me about it, as I told Sergeant Sonberg.'

"In other words, you can consider that, when a person could be expected to know something about something, and he doesn't tell you what obviously he must know, why, then you can draw certain inferences from that.

"And, as I say, ladies and gentlemen, there is no evidence on behalf—that the defendant has put in here.

"So, the only way we can be attacked is that we haven't proven case, we haven't made out a case because of certain suspicions or inferences or something like that, showing there was another man, or something like that. That hasn't been testified to here.

"Now, you can't guess as to what Mr. Anderson would or would not have tes-

of contrary evidence is a proper subject of comment, except that there may be none on the absence of testimony by the accused. We are convinced, in this particular case, beyond a reasonable doubt, that the error was harmless and that it did not contribute to Anderson's conviction. We have not the slightest doubt that, if the error had not been committed, Anderson would still have been found guilty.

Reversed, with directions to deny the writ.

ELY, Circuit Judge (dissenting):

I respectfully dissent. The introduction of statements made by the accused would now be constitutionally impermissible. They were admitted over objec-

tion, and while the appellee suffered whatever disadvantageous interpretation may have been placed upon them, he was effectively deprived of the benefit of portions of the statements which might have operated in his favor. As to them, the opinion of the California appellate court recites, "Appellant's statements were not a confession. He consistently denied endorsing the forged instrument. At most, his statements connect him with transmitting the check to Kernen, but not with knowledge of the forgery." Conceding that we may have disagreed with a verdict of acquittal, in the event there had been one, the jury was practically disempowered, by unconstitutional procedures, to accept the appellee's protestations, made in his statements, of his innocence.[1] I hold the view that when it

tified to if he did get on the stand, because you haven't heard it. You will have to base your decision on those documents and the people you have heard here. If you don't believe any of them, you will probably not find him guilty; but if you do believe them—there has been no contradiction, nobody has contradicted them at all—then you are only led to one conclusion, and that simply is the fact that the defendant is the one that passed that check, and is guilty here.

"Remember, you have no conflicting evidence on the other side. You either would have to disbelieve the Calverts, Michael Pittman, and Mr. Kernen and Sergeant Sonberg and the rest of them. "No one came in and said, 'No, that isn't it; he was somewhere else.' You heard nothing like that, ladies and gentlemen.

"There hasn't been any evidence that has been produced to controvert it. Nobody has come in here and told you Mr. Anderson was somewhere else, or he didn't do it, or he didn't come up and get that check, and 'I didn't know anything about it, and I went in there innocently to pass it.' He didn't tell you that at all.

"I give him credit for not getting up on the stand and trying to tell you a lie. At least he had the ability to sit there and not say anything, rather than try to get up and tell you a whole lot of hogwash. I'll at least give him that much credit.

"There is some disputed evidence that Mr. Anderson showed up with this check and passed it on Kernen on the 29th.

"Now, if he got it some innocent way, if somebody gave it to him, that he didn't know, then he should have gotten up on the stand to tell us about it. And don't you think if that is what happened, he would have? I would; you would. You would beat a path to that stand, at least to get up there and tell them what happened. But that isn't the situation here. "Now, we don't know what Mr. Anderson's story is, because you haven't heard it.

"That's what he told Seargeant Sonberg, three completely phony, different versions of it.

"You didn't see him get up, you didn't hear the words from him, because he didn't get up on the stand. You don't know what his story may be today. He might have told you another story, that he was flying around up in Alaska, or something like that. I don't know."

1. Appellee offered no witnesses or direct evidence in his defense. The check in question, payable to one Michael Pittman, was for the sum of $198.26. Appellee's brother was a customer of the automobile service station operator to whom the check was passed and was indebted to the operator for approximately $110. In exchange for the check, appellee received only about $88 in cash, directing that his brother's account be paid with the balance. Appellee's counsel argued, in effect, that the open manner in which appellee passed the check to one to whom he was known, together with appellee's statement of innocence to the arresting

was not unlawful to use it, the prosecutor's most destructive weapon was comment upon a defendant's failure to testify in exculpation. For that reason I could not say, in any case wherein there is evidence, as here, which might have supported acquittal, that the prosecutor's unconstitutional comments were "harmless beyond a reasonable doubt." This is particularly true when the illegal comments, set forth in the majority's footnote 5, were so effectively made.

Moreover, I believe that we, in any event, should have remanded the cause and given the district judge the first opportunity to review his decision. I concede that since the test of Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), had not been announced at the time of the District Court's decision so that appellant could have asserted a failure to exhaust state remedies, considerations of comity do not now require referral to the California courts. Compare Blair v. People of State of California, 340 F.2d 741 (9th Cir. 1965), followed in United States ex rel. Walker v. Fogliani, 343 F.2d 43 (9th Cir. 1965). At the same time, we, as a reviewing court, should not, I believe, undertake first to determine a problem which, for resolution, requires the consideration of opposing factual, as well as legal, interpretations.

In this case there are additional reasons which should have influenced the majority not to divest the District Court of power to review its judgment. It is conceded that appellee's statements would have been, under rules recently announced by the Supreme Court in *Miranda,* un-constitutionally received into evidence. The rules of *Miranda* had been anticipated and established by the California court in People v. Dorado, 62 Cal.2d 338, 42 Cal.Rptr. 196, 398 P.2d 361 (1964), but the violation of the rules, as they existed under *Dorado,* was held in appellee's direct appeal to have been harmless under the California test.

The California court also dismissed as "harmless error" the prosecution's erroneous introduction into evidence of appellee's photograph. As to this, the state court wrote, "Nevertheless the photograph had no proper place in the evidence and should not have been admitted. The photograph does, however, clearly convey to the jury the fact of appellant's prior custody." I agree with the majority that this particular question is concerned with state law; notwithstanding, it cannot be disregarded in an over-all appraisal of the state court trial in relation to federal requirements.

Upon the foregoing errors were superimposed the most glaring and surely the most devasting, namely, the prosecutor's repeated comments concerning appellee's failure to testify and the trial judge's improper instruction concerning such failure.[2]

Of all this, the district judge wrote, "This court should not and will not treat these cumulative denials of constitutional rights as one would homeopathic drugs, which though harmful when taken in large doses, yet when taken in small doses may produce a salutary effect. The denial of constitutional rights is a dangerous and harmful poison even in doses of homeopathic proportions." This ex-

officers, created, without more, a reasonable doubt as to his client's guilt.

**2.** The jury was instructed, "As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if,

though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom, those unfavorable to the defendant are the more probable."

pression followed the court's general conclusion that "The harmless error rule has no application to a denial of constitutional rights, particularly when the denials of such rights are numerous and cumulative as in the instant case."

I cannot say that the District Court's conclusion was clearly erroneous, regardless of whether the California test or the new federal test of *Chapman* is applied to one of the errors, the violation of the rule of *Griffin*. If it is necessary to review the conclusion in the light of *Chapman*, then, as I have suggested, the district judge should be afforded the first opportunity for re-examination.

Since the appellee did not allege that the accumulation of errors in the state trial proceeding resulted in a trial so substantially unfair as to violate federal requirements of due process, it is not clear that the District Court has yet directed its specific attention to that issue.[3] See Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Chavez v. Dickson, 280 F.2d 727 (9th Cir. 1960); Pike v. Dickson, 323 F.2d 856 (9th Cir. 1963).

3. The record before us does not contain the unpublished opinion of the California appellant court (Crim. No. 4768 in the District Court of Appeal of the State of California, First Appellate District, Division Three). In its "Order for Discharge of the Petitioner," the District Court included only a portion of the state court's opinion. The excerpts reveal that the state court held that the two errors of constitutional dimension and the evidentiary error relating to the photograph were "harmless." They do not disclose, and neither does the whole opinion, which I have obtained and examined, that the state court considered other errors which the record suggests and which the District Court did not discuss. For example, the prosecution, although it had exemplars of appellee's handwriting, introduced two other exemplars over the objection of appellee's counsel. These were included in two "booking slips" which, while containing examples of appellee's handwriting, also prejudicially made it

known to the jury that the appellee had previously been twice arrested. Under the circumstances, and on balance, the two "booking slips" should not have been admitted.

The prosecutor abused his power in other respects. In his opening statement, while discussing an effort made by appellee to obtain employment, he commented, "Because he [appellee] was a lousy truck driver and scared him [the prospective employer], he naturally brought him back and didn't hire him." This followed his statement that appellee had "represented" to the prospective employer that he, appellee, "was a truck driver" and "would do * * * a good job." In the prospective employer's subsequent testimony about the event, admitted over the objection that it was irrelevant, he testified that appellee's driving was "unsatisfactory for me," but he did not testify that appellee's driving was "lousy" or so reckless that it "scared him."