492 F.2d 199
 UNITED STATES of America, Plaintiff-Appellee,
v.
Harry Contreras VALDIVIA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Roy COHN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Warren Lonnel HARRIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee.
v.
Carl TURNER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
William Joseph FREEDMAN, Defendant-Appellant.
Hernandez Cases.
Group III Appeals.
 Nos. 71-2093-- 71-2096, and 71-2141.
 United States Court of Appeals, Ninth Circuit.
 Feb. 16, 1973.
Rehearing Denied in Nos. 71-2094-- 71-2096, Oct. 18, 1973.
Certiorari Denied April 15, 1974.
See 94 S.Ct. 1945.
 
 Frank A. Rockwell (argued), San Diego, Cal., Jonathan K. Golden (argued), Burton Marks, Beverly Hills, Cal., Roger S. Hanson (argued), Woodland Hills, Cal., Rembert T. Brown (argued), La Mesa, Cal., for defendants-appellants.
 James W. Meyers, Asst. U.S. Atty. (argued), Phillip W. Johnson, Special Asst. Atty. Gen., Harry D. Steward, U.S. Atty, San Diego, Cal., for plaintiff-appellee.
 Before HAMLEY and CHOY, Circuit Judges, and SCHNACKE,* District judge.
 HAMLEY, Circuit Judge:
 
 
 1
 This case involves the so-called Hernandez narcotics conspiracy. The general background of that conspiracy is developed in detail in our opinion, filed today, in United States v. Baxter, et al., 492 F.2d 150 (9th Cir. 1973). In that opinion we noted that the district court had divided the forty-nine defendants named in a two-count indictment into three groups for trial.
 
 
 2
 The Baxter decision deals with the appeals arising from one of these trials, which we have labeled the Group I appeals. The decision of this court, filed today in United States v. Murray, et al., 492 F.2d 178 (9th Cir. 1973), deals with the appeals arising from another of these three trials, and has been labeled the Group II appeals. The appeals now before us arise from the third of these trials, and our decision herein has been labeled the Group III appeals.[1]
 
 
 3
 The defendants involved in the Group III trial were Harry Contreras Valdivia, Roy Cohn, Warren Lonnel Harris, Carl Turner, William Joseph Freedman, Herbert Cox, Jr., Marion Hawkins and H. S. Sanford. The charges against Sanford and Hawkins were severed for separate trial. The jury found Cox not guilty on both counts. The jury found the remaining five defendants guilty on both counts.[2] Each has appealed and we have consolidated their appeals for disposition in this court.
 
 
 4
 I. Proof of Conspiracy and Severance for Trial
 
 
 5
 Some of the defendants involved in this appeal contend that the evidence is insufficient to establish that they participated in a single over-all conspiracy of the kind charged in the indictment.
 
 
 6
 At the outset of section I of our opinion in the Group I appeals, United States v. Baxter, et al., 492 F.2d 150 (9th Cir. 1973), filed today, we discussed the general considerations to be borne in mind in dealing with challenges to the sufficiency of the evidence to support conspiracy charges. What we there said is equally applicable here and will serve as an introduction to our discussion of the sufficiency of the evidence to support the conspiracy charges against defendants who have raised the question. We also note that the evidence pertaining to the background facts of the single over-all conspiracy as introduced in this Group III trial, is essentially the same as that introduced at the Group I trial, summarized in the Baxter opinion.
 
 
 7
 Defendant Cohn. Although Cohn does not specifically question the sufficiency of the evidence supporting his conviction on the conspiracy count, he does adopt all of the arguments raised by other appellants in the Hernandez Cases. We deem this sufficient, under the special circumstances of this case,[3] to challenge the sufficiency of the evidence, but we conclude that Cohn's contention is without merit.
 
 
 8
 Cohn was the Hernandezes' distributor in the Los Angeles area. He was frequently in contact with the leaders of the Hernandez organization in Tijuana. Orders from retailers in the Los Angeles area were given to Cohn by Richard Wright. Cohn would then receive the smuggled narcotics and 'fill' the customers' orders. Thus, Cohn knew both the existence and size of the Hernandez operation, and there is sufficient evidence to prove his participation in a single, over-all conspiracy. There is no variance between the crime charged in the indictment and the proof at the trial.
 
 
 9
 Defendant Harris. The jury could reasonably have found the facts to be as follows with regard to Harris' connection with the over-all Hernandez narcotics operation: A page in the Hernandez 'customer book,' exhibit 601, is headed 'LYNIL-J. A. WHITE' and '753-2036.' Richard Wright testified that 'Lynil' was the name this customer used when calling to order narcotics and 'J. A. White' was the name he employed in sending telegrams, checks or money orders to the Hernandezes. This page of the 'customer book' shows that 'LYNIL-J. A. WHITE' was charged three hundred twenty-five dollars an ounce for heroin and five hundred fifty dollars an ounce for cocaine. The entries on that page reflect sales of over a pound of heroin and two ounces of cocaine, with a sales value of $6,525.00, during a fifty-three-day period in October and November, 1968.
 
 
 10
 Telephone number 753-2036 was listed to Harris' wife, Elizabeth Harris, at their residence in Inglewood, California. United States Customs agents arrested Harris at this residence on December 17, 1968. The agents found two address books, with handwritten entries made by Harris, at the scene of his arrest. Both books contained the Juan Hernandez telephone number in Tijuana, Mexico, and telephone number 384-8035, which was the 'subtract-from-ten' code for the Hernandezes' main number in Tijuana.
 
 
 11
 Two Bank of America cashier's checks, payable to Robert Hernandez, and the applications therefor, were admitted as evidence at the trial. The first, which Robert Hernandez negotiated, was dated April 17, 1968, and was in the amount of $4,875.00. This check was signed 'James L. Brown.' The second, dated December 9, 1968, was in the amount of five hundred fifty dollars. It was signed 'J. A. White.' Richard Wright turned this check over to Government agents before it could be negotiated by Hernandez. Envelopes addressed to Robert Hernandez, with Wright's notations on the back, were also introduced. A handwriting expert testified that the signatures on the application forms and the addresses on the envelopes, were all written by defendant Harris.
 
 
 12
 Other evidence establishing Harris' identity as 'LYNIL-J. A. WHITE' is a recorded telephone conversation of December 7, 1968, between Wright and Hernandez-distributor Roy Cohn. In this conversation, Wright instructed Cohn as to an order from 'Lynil.' The telephone number which Cohn was to call was that listed to Harris' wife.
 
 
 13
 The direct and circumstantial evidence discussed above shows that Harris was in contact with the Hernandezes' main headquarters in Tijuana, with Juan Hernandez in Tijuana, with Wright while Wright was a Hernandez operative, and with Roy Cohn.
 
 
 14
 Having in mind the background evidence pertaining to the over-all conspiracy, which was similar to that reviewed in the Group I appeals opinion, and the evidence which relates specifically to Harris, as summarized above, we are of the view that the jury could reasonably find that Harris must have known that other retailers, in addition to himself, were involved with the Hernandez organization in a broad plan for the smuggling, distribution and retail sale of narcotics. The jury could also reasonably find that Harris must have realized that the benefits he and the other retailers derived from the operation were dependent upon their mutual participation therein.
 
 
 15
 These basic findings are ample to support the jury determination that Harris, in effect, agreed to participate in the over-all scheme, and did participate therein. See Blumenthal v. United States, 332 U.S. 539, 557, 558, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Friedman, 445 F.2d 1076, 1079 (9th Cir. 1971); Daily v. United States, 282 F.2d 818, 820 (9th Cir. 1960).
 
 
 16
 We therefore hold the evidence sufficient to establish the existence of the over-all narcotics conspiracy, as charged, and Harris' participation therein.
 
 
 17
 Defendant Freedman. The jury could reasonably have found the facts to be as follows concerning Freedman's connection with the over-all Hernandez narcotics operation: A page in the Hernandez 'customer book,' exhibit 601, is headed 'Louie Bigg,' 'Louie or Bill,' '278-1128,' '466-0413.' One of these telephone numbers, 278-1128, was listed to Freedman at his Los Angeles residence. United States Customs agents arrested Freedman at this residence on December 17, 1968. Exhibit 641 shows four telephone calls made from that telephone, within an eight-day period, to the Hernandezes' main number in Tijuana.
 
 
 18
 The other telephone number found on the 'Louis or Bill' page of the 'customer book' was listed to a 'Pamela Harvey,' whose real name was Pamela Buek. She had that telephone in her Hollywood, California, apartment during October and November, 1968. Louis Hattem, an indicted co-conspirator in this case, lived with her for a period of time and he used that telephone. She never called Tijuana while she had that telephone. Yet telephone company records show that a call was made to the main Hernandez number in Tijuana.
 
 
 19
 In the fall of 1968, both Hattem and Freedman journeyed to the Hernandez residence in Tijuana to talk to Robert Hernandez. Hattem was an old customer of the organization and he introduced Freedman as his 'partner,' and told Hernandez that they had come down to buy marijuana and cocaine. A handwritten telephone book found in Freedman's apartment had an entry 'Lou H. 466-1502,' which is the same number as that of Hattem's girl friend, Pamela Buek, after she changed her telephone number in November, 1968.
 
 
 20
 The 'Louie or Bill' page of the Hernandez 'customer book' reflects sales of eight ounces of heroin and one ounce of cocaine, for $3,150.00, during a sevenday period in October, 1968. Five Western Union money orders, addressed to 'Hernandez Construction Company' at the Hernandez residence in Tijuana were signed by Freedman under the name 'Louis Bigg.' These money orders were in amounts ranging from three hundred twenty-five dollars to eight hundred seventy-five dollars. The direct and circumstantial evidence reviewed above could reasonably lead the jury to find that Freedman was in contact with Robert Hernandez, Cohn, the Hernandez distributor, Hattem, another retailer, and Lannom and Wright, who were top Hernandez operatives at the time.
 
 
 21
 As in the case of defendant Harris, we believe the general background evidence concerning the nature of the over-all conspiracy, and that which pertains specifically to Freedman, as reviewed above, warranted the jury in finding that Freedman knowingly associated himself with what he must have realized was a general conspiracy to smuggle, distribute and retail narcotic drugs. Accordingly, the evidence was ample to sustain the jury finding as to the existence of the over-all narcotics conspiracy and Freedman's participation therein.
 
 
 22
 Defendant Turner. Turner has not devoted a specific section of his brief to an argument that the evidence is insufficient to tie him in with the over-all Hernandez narcotics conspiracy. Yet the statement of facts set out in his brief is presented in such a way as to at least imply that Turner deems the Government evidence insufficient. We have therefore examined the evidence tending to tie Turner in with the single over-all conspiracy and conclude that it is sufficient.
 
 II. Searches and Seizures[4]
 
 23
 Cohn and Freedman argue that evidence received at the trial was obtained as a result of unlawful searches and seizures.
 
 
 24
 Defendant Cohn complains of the search of his residence, asserting that a search warrant should have been obtained and that the search was too extensive. The search was incident to a lawful arrest. We have noted above that Harris, rather than the more stringent test of Chimel, is applicable here. United States v. Baxter, 492 F.2d 150 (9th Cir. 1973). A search of the entire premises was justified. Harris v. United States, 331 U.S. 145, 151-152, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The possibility of obtaining a search warrant does not render the search unlawful. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).
 
 
 25
 The preceding discussion likewise disposes of the arguments of defendant Freedman, whose residence, entered after appropriate identification, was also searched for contraband incident to a lawful arrest. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); United States v. De La Cruz Bellinger, 422 F.2d 723 (9th Cir. 1970).
 
 III. Miscellaneous Contentions by Valdivia
 
 26
 1. Admissibility of exhibit 786. Exhibit 786 is a Western Union money order dated October 29, 1968, payable to Robert Hernandez at the Hernandezes' Tijuana residence, in the sum of one thousand three hundred dollars. While the money order is signed 'Harry C. Valdivia,' a Government handwriting expert testified that it was not in the hand of Valdivia. Valdivia argues that the admission of exhibit 786 constituted prejudicial error because the Government did not prove that the money order was made during the regular course of business, and because the Government did not establish proof of the money order's authenticity.
 
 
 27
 Exhibit 786 was first offered in evidence by Valdivia's own trial counsel. The same exhibit, along with several others, was later received in evidence as a Government exhibit. Still later Valdivia's counsel called attention to the fact that Government exhibit 786 had originally been offered by the defense, and requested that it be withdrawn as a Government exhibit and readmitted as a Valdivia defense exhibit. There was no objection and this was done.
 
 
 28
 If the admission of exhibit 786 was error, it was invited error, concerning which Valdivia is in no position to complain. United States v. LeVison, 418 F.2d 624, 626 (9th Cir. 1969).
 
 
 29
 2. Admissibility of testimony linking Valdivia to Juan Hernandez. Valdivia argues that Wright's testimony linking Valdivia to Juan Hernandez was, for various reasons, inadmissible, and should have been excluded. The testimony in question was to the effect that Juan Hernandez was a participant in the conspiracy led by Robert and Helen Hernandez.
 
 
 30
 Valdivia complains that this testimony by Wright is inadmissible because it was not corroborated. This argument is difficult to follow because, at the outset, Valdivia concedes that, in the Ninth Circuit, the rule is that the uncorroborated testimony of an accomplice is, of itself, sufficient to sustain a conviction, if believed. See United States v. Bagby, 451 F.2d 920, 930 (9th Cir. 1971); United States v. Jones, 425 F.2d 1048, 1055 (9th Cir. 1970); United States v. Garcia, 422 F.2d 1301, 1302 (9th Cir. 1970). But then Valdivia, in an apparent attempt to advocate a contrary rule, cites Darden v. United States, 405 F.2d 1054, 1056 (9th Cir. 1969), for the proposition that an accomplice's uncorroborated testimony is admissible 'if the testimony is not 'incredible or unsubstantial on its face."
 
 
 31
 If the Darden opinion read as quoted by Valdivia, it would be internally inconsistent, for it would be saying, in effect, that 'an accomplice's uncorroborated testimony is admissible if it is corroborated.' What the Darden opinion actually says is that 'a conviction in federal court may be based on the uncorroborated testimony of an accomplice, if the testimony is not 'incredible or unsubstantial on its face." 405 F.2d at 1056. We see no reason why this testimony by Wright should not be regarded as substantial.
 
 
 32
 Valdivia also calls attention to the following language in United States v. Williams, 435 F.2d 642, 645 (9th Cir. 1970):
 
 
 33
 'The admissions and statements of a co-defendant are admissible as against the other even in the absence of a conspiracy count where there is independent evidence of a concert of action.'
 
 
 34
 We fail to perceive the relevance of the quoted observation, which merely states the familiar rule that the extrajudicial statements of one defendant are admissible if a concert of criminal action has been independently established. See Kay v. United States, 421 F.2d 1007, 1010 (9th Cir. 1970). Wright was not a codefendant, nor are we here concerned with his out-of-court statements, but rather his in-court testimony which was subject to full cross-examination. Moreover, the questioned testimony of Wright was in fact corroborated. Federal Narcotics Agent Robert J. Dunne, in answer to a specific question by the defense, testified without objection that 'Robert, Helen and John Hernandez are the organization.'[5]
 
 IV. Withholding Evidence Favorable to Cohn
 
 35
 Cohn contends that the Government knew, but did not disclose to Cohn or his counsel, that Joe Silva, while a Hernandez distributor, had contacted someone named 'Roy' on the telephone, and then made narcotics deliveries to that person, but positively identified the person as someone other than defendant Roy Cohn, namely, cohn's cousin, Irving Kipnis.
 
 
 36
 Cohn urges that had he been able to produce this testimony by Silva at the trial it would have been of utmost value to Cohn. This is true, Cohn argues, because (1) it would contradict the testimony of Donald Lannom that he trained Roy Cohn to be his replacement as distributor for the Hernandez group, (2) it would contradict the Government's contention that Roy Cohn's telephone number appeared in the 'customer book,' and (3) Cohn could then testify that Kipnis had complete access to Cohn's home and that the address of La Cienega and Venice, which appears in various police information sheets and on a page in the Hernandez records tied in with 'Roy,' is near Kipnis' home and office.
 
 
 37
 We start with the proposition that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution.' Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). Even the negligent suppression of evidence is not permitted, and the defendant is entitled to a new trial. United States v. Consolidated Laundries Corp., 291 F.2d 563, 570-571 (2d Cir. 1961). See also, Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).
 
 
 38
 Here, however, while disclosure of the evidence was delayed until near the end of the trial, it was not completely suppressed, and Cohn did have an opportunity to go into the matter at the trial, but chose not to do so. Moreover, Silva's testimony would not have been of material aid to Cohn but, in fact, would have substantially supported the Government's case against him. See Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).
 
 
 39
 The statement by Silva on which Cohn relies was unknown to the United States Attorney, but was known by a Customs agent. The latter considered it to be of no significance. Nevertheless, on April 28, 1970, two days before the case went to the jury, the agent disclosed this information to Cohn. Cohn informed his counsel of this on the night of April 29, 1970. This was before the jury was instructed on the morning of April 30, 1970.
 
 
 40
 Cohn's counsel could have, prior to the giving of the instructions, moved to reopen the case for the purpose of receiving Silva's testimony. However, he did not inform the trial court of this development until after the jury had been instructed, and did not then ask that the case be reopened. We are therefore left with the impression that Cohn preferred to gamble upon the jury verdict and attempted to preserve the point for appeal.
 
 
 41
 More importantly, however, Silva's information, in conjunction with the other evidence in the case, would have shown that Silva was delivering Hernandez narcotics to Cohn, who sent Kipnis to meet Silva to receive the narcotics. Silva's testimony would have corroborated the testimony of Lannom and Wright regarding the Hernandez conspiracy and particularly the testimony regarding the use of the code and their testimony about Cohn. In addition, this testimony by Silva would have been corroborated by his delivery book, Government exhibit 649 for identification, which contained Cohn's telephone number in code.
 
 
 42
 Silva's testimony probably would not, as urged by Cohn, contradict Lannom's statement that he trained Cohn as his replacement as distributor for the Hernandez group. This is true because Lannom could have trained Cohn after completion of Silva's five-month service as distributor. The Government can hardly be faulted for not knowing that Cohn could have testified that Kipnis had complete access to Cohn's home. In any event, Cohn would have had difficulty explaining how Kipnis was using Cohn's voice on telephone calls.[6]
 
 
 43
 We conclude that there was no reversible error with regard to the asserted failure to disclose Silva's information referred to above.
 
 V. Miscellaneous Contentions by Harris
 
 44
 1. Sufficiency of evidence on count two. In count two of the indictment the grand jury charged that, on or about December 1, 1968, all of the defendants, including Harris, knowingly used telephone, wire and other means of communication in San Diego County in facilitating the commission of, and attempting to commit the importation, concealment, and sale of heroin and cocaine, narcotic drugs, the penalty for which offenses is provided in 21 U.S.C. 174, in violation of 18 U.S.C. 1403(a).[7] As before noted, Harris was convicted on this charge as well as on the conspiracy count.
 
 
 45
 Harris argues that the evidence is insufficient to support the jury verdict on this charge. He notes that the Government presented evidence which indicated that Harris had sent two cashier's checks to Robert Hernandez using, in one instance, a name, J. A. White, which also appeared in the Hernandez 'customer book.' But Harris urges that the Government offered no evidence to relate these cashier's checks to drug transactions. Nor was there, Harris asserts, any evidence that any drug transactions occurred as a result of any communication, writing, wire or telephone call with respect to Harris.[8]
 
 
 46
 Testimony of Richard Wright that 'Lynil' was the name used by one of the Hernandezes' customers in calling to place narcotics orders, and evidence establishing Harris' identity as 'Lynil,' has already been examined. When Harris was arrested, in his possession were the main Hernandez telephone number and the telephone number of Juan Hernandez. From this evidence the jury might reasonably infer that Harris contacted the Hernandezes by telephone. However, there is no evidence showing that any calls made by Harris to the Hernandezes came from California.
 
 
 47
 Evidence of Bank of America cashier's checks sent by Harris to Robert Hernandez in Tijuana will not sustain Harris' count two conviction. There was testimony that all telephone calls made, and all Western Union money orders sent, from California to Tijuana must pass through San Diego County. But there was no such testimony with regard to mail sent from California to Tijuana.
 
 
 48
 We therefore hold that the evidence is not sufficient to support the conviction of Harris for using communication facilities in San Diego County, as charged in count two of the indictment.[9]
 
 
 49
 2. Adequacy of foundation for introduction of exhibits 876-886 and 954-955. Exhibit 876 is a Los Angeles Police 'booking card' on a Warren Lonnel Harris, listing his wife as 'Elizabeth Harris.' Exhibits 877-886 are copies of ten requests from a federal prisoner by the name of 'Harris,' taken from the files of the United States Department of Justice, in which documents the wife's name was given as 'Elizabeth Harris.' Exhibit 955 is a copy of an appearance bond filed by 'Warren L. Harris' of 2606 West 78th Place, Inglewood, California, on February 20, 1969. This bond was filed in the instant case and it is upon this bond that Harris is currently at liberty. Exhibit 954 is a copy of an order appointing counsel in case number 4665, signed 'Warren L. Harris' on December 17, 1968, and filed in the office of the Clerk for the Southern District of California. This indictment was superseded by indictment number 5108 in the instant case.
 
 
 50
 Harris argues that each of these documents is deficient as to foundation within the meaning of the decision of this court in United States v. Estrada, 441 F.2d 873, 876-877 (9th Cir. 1971).
 
 
 51
 All of these exhibits were introduced as 'standard writings' or exemplars, on the basis of which the Government sought to prove the authenticity of certain 'questioned documents,' introduced as exhibits 798, 800, 632-635, 810 and 811. The questioned documents were as follows:
 
 
 52
 Exhibit 798-- a negotiated Bank of America cashier's check in the amount of $4,875.00, number 359 23861, and the associated application;
 
 
 53
 Exhibit 800-- application for Bank of America cashier's check number 0331 20824 (exhibit 976);
 
 
 54
 Exhibits 632-635-- envelopes addressed to 'Robert Hernandez, 13 Tehuacan, Tijuana B.C. Mex.';
 
 
 55
 Exhibits 810 and 811-- handwritten address books found at the Harris residence during a search indident to his arrest.
 
 
 56
 Harris did not object to the reception in evidence of any of these 'questioned documents,' on the ground that his signatures thereon had not been properly authenticated.[10] Nor did Harris object to the introduction of the exemplar exhibits, numbers 876-886, 954-955, which he now challenges, on the ground that his signature thereon had not been properly authenticated.[11]
 
 
 57
 Where documents purporting to bear exemplar signatures are received in evidence without objection, it may not be contended on appeal that the exemplars had not been adequately identified. See United States v. Markham, 440 F.2d 1119, 1123 (9th Cir. 1971). Here not only was there no objection to the admission of the exemplars on the ground of insufficient identification, but there was likewise no such objection to the admission of the basic exhibits concerning which the exemplars were utilized to extablish authenticity. We accordingly decline to reach this contention on the merits.
 
 VI. Miscellaneous Contentions by Turner
 
 58
 1. Admissibility of Western Union money orders. Turner argues that the money orders (exhibits 782 and 785) bearing the name Robert Fredericks should have been suppressed upon the ground that they were divulged to a Government agent in violation of 47 U.S.C. 605.
 
 
 59
 A similar contention was made in the Group I Hernandez appeals, and was rejected by this court. See section IV of the opinion in United States v. Baxter, 492 F.2d 150 (9th Cir. 1973). On the same reasoning we hold this argument by Turner to be without merit.
 
 
 60
 2. Photographic identification. Turner contends that he was deprived of the right to counsel at a photographic 'line-up' and that this deprived him of a 'meaningful' attack upon his in-court identification by an eyewitness, contrary to his rights under the Sixth Amendment.
 
 
 61
 Ellen Domingue, night manager of Western Union in Inglewood, California, identified Turner as the person who, using the name 'Robert Fredericks,' purchased two Western Union money orders, one on September 8, 1968, and the other on October 8, 1968. She had viewed this person in a well-lit business office on the two occasions of from two to five minutes each. On voir dire, Mrs. Domingue stated that a Customs agent came to her in April, 1969, to talk to her about these transactions. The agent showed her a file containing two to six snapshots of different men, and then she described Fredericks to him. The officer did not verbally or otherwise emphasize any of the photographs.
 
 
 62
 From these photographs Mrs. Domingue selected one, a black man with a goatee, as the 'Robert Fredericks' she had waited on. Only one of the two to six pictures showed a man with a goatee, and at least one of the pictures showed a white man.
 
 
 63
 Just before she took the witness stand at the trial, a year and a half later, Mrs. Domingue was shown six more pictures of men, only two of whom wore beards. None of them was the picture she had selected in April, 1969, as Robert Fredericks. She could not identify any of them as Fredericks. However, she was shown the same photographs again while on the witness stand and then identified one as Fredericks. Turner (Fredericks) was not represented by counsel during the first two times pictures were shown to this witness.
 
 
 64
 In the courtroom, during voir dire, Mrs. Domingue identified Turner as the Robert Fredericks who had purchased the two money orders from her. Counsel for Turner objected to Mrs. Domingue's identifying Turner before the jury as the Robert Fredericks who had purchased the money orders. His argument was that the prior showing of photographs to Mrs. Domingue deprived him of due process of law. The objection was overruled and Mrs. Domingue so testified before the jury.
 
 
 65
 As indicated at the outset of the discussion of this point, Turner predicates his argument on this branch of the case primarily upon the theory that, under United States v. Wade, 388 U.S. 218, 236-237, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), Turner was entitled to the presence of counsel when the photographs were shown to Mrs. Domingue. Similar contentions have repeatedly been rejected by this court.[12] Turner cites United States v. Zeiler, 427 F.2d 1305 (3d Cir. 1970), but the Ninth Circuit has expressly refused to follow Zeiler. See United States v. Williams, 436 F.2d 1166, 1169 (9th Cir. 1970). In United States ex rel. Reed v. Anderson, 461 F.2d 739, 745 (3d Cir. 1972), the Third Circuit overruled its ruling in Zeiler concerning pretrial photographic identification.
 
 
 66
 However, Turner also argues that the photographic identification procedures here in question were impermissibly suggestive and for this reason Mrs. Domingue's identification of Turner should have been excluded. This calls for application of the principles announced in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), discussed at length in section VI of our opinion in the Hernandez Group I appeals, United States v. Baxter, 492 F.2d 150 (9th Cir. 1973). We refer to the discussion in our Group I appeals opinion for a full statement of the applicable principles.
 
 
 67
 As indicated in Simmons, 390 U.S. at 383, 88 S.Ct. 967, and in our discussion in section VI of the opinion in the Group I appeals, a claim that an identification procedure is impermissibly suggestive is to 'be evaluated in the light of the totality of the surrounding circumstances.'
 
 
 68
 We are here concerned only with the 'totality of circumstances' concerning the initial display of photographs in April, 1969. The second display, immediately before Mrs. Domingue testified, is irrelevant for present purposes because Mrs. Domingue did not then identify any photograph as that of Robert Fredericks. The third display was in the courtroom, while Mrs. Domingue was on the witness stand, in the presence of Turner (Robert Fredericks), and his counsel.
 
 
 69
 Concerning the April, 1969, photographic display, the first standard to be applied is whether the use of photographic identification was necessary in order to connect Turner with the crime, and apprehend him. Turner was already in custody when Mrs. Domingue was first shown these photographs, so the Government failed to show necessity. However, this is not a per se ground for rejection of the identification. Where, as here, the witness testified as to the pretrial identification only in answer to questions asked by the complaining defendant, possible prejudice resulting from the lack of necessity for the pretrial photographic procedure can hardly be charged to the Government. See United States v. Fowler, 439 F.2d 133, 134 (9th Cir. 1971).
 
 
 70
 The second standard to be applied (see Simmons, 390 U.S. at 385, 88 S.Ct. 967), is whether there was a very substantial likelihood of irreparable misidentification. As developed in our discussion of the problem in the Hernandez Group I appeals, there are four specific indicators commonly considered in applying this standard. These indicators are: (1) the length of time and the conditions under which a witness was able to observe the perpetrator during the commission of the crime (here, during the purchase of the money orders), (2) the similarity of the description given by a witness immediately after the crime to the physical characteristics of the individual he subsequently identifies, (3) conduct on the part of the police tending to focus attention on a particular subject, and (4) presence of other witnesses at the time of the improper identification and the possible prejudicial influence of one witness' opinion on another's recollection. See Parker v. Swenson, 332 F.Supp. 1225, 1230-1231 (E.D.Mo. 1971).
 
 
 71
 The fourth of these indicators is not applicable here. Considering the first three in the light of the totality of circumstances concerning the April, 1969 photographic display, as reviewed above, we conclude that that display was not impermissibly suggestive. Evaluation of the probative value of Mrs. Domingue's identification testimony was for the jury.[13]
 
 
 72
 VII. Failure to Instruct as to Defendants' Knowledge of Narcotic Character of Imported Drugs
 
 
 73
 Freedman and Cohn contend that the jury should have been instructed that it was essential to prove that they had knowledge that imported substances were cocaine or heroin. As no such instruction was requested, the failure to so instruct would not be reversible error unless it constituted plain error under Rule 52(b), Fed.R.Crim.P. Davis v. United States, 425 F.2d 673 (9th Cir. 1970).
 
 
 74
 Freedman also argues that the Government failed to prove he had such knowledge.
 
 
 75
 It was not necessary for the court to instruct in regard to knowledge of the character, as narcotics, of the imported substances. The conspiracy charge related to planned future activity. All elements of the crime of conspiring existed before any importation occurred. Defendants would have been no less guilty if there had been no importation. See Hopkins v. United States, 405 F.2d 770, 771 (9th Cir. 1969); Harney v. United States, 306 F.2d 523, 531 (1st Cir. 1962).
 
 
 76
 We therefore conclude that there was no plain error in failing to give, sua sponte, an instruction concerning defendants' knowledge of the narcotic character of the imported substances. For the same reason we hold that there was no failure of proof in this regard.
 
 
 77
 Other contentions advanced by defendants have either been adequately dealt with in discussing similar arguments raised in the opinions disposing of the Hernandez Group I or Group II appeals, or do not have sufficient merit to warrant discussion.
 
 
 78
 The judgments of conviction and sentences on count one of the indictment in these Group III appeals are affirmed. Harris' conviction on count two is reversed.
 
 
 
 *
 The Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 As stated in note 2 of the Group I opinion, the defendants charged in another indictment involving the same general narcotics conspiracy were tried in a fourth trial and the appeals arising therefrom, decided today in United States v. Mickens, et al., 492 F.2d 211 (9th Cir. 1973), have been labeled the Group IV appeals
 
 
 [2]
 The sentences imposed were as follows: Valdivia-- following examination, found to be a narcotic addict and committed for treatment for a period not to exceed ten years; Cohn-- twenty years imprisonment on count one, and two years on count two, to run concurrently; Harris-- thirteen years on count one, and two years on count two, to be served concurrently; Turner-- six years on count one and two years on count two, to run concurrently; Freedman-- ten years on count one and two years on count two, to be served concurrently
 
 
 [3]
 We allow Cohn to adopt this particular contention only because the Government has summarized in its brief the facts regarding Cohn's participation in the Hernandez organization. We do not, however, hold that unlimited adoption would be permitted, or that selective adoption would be permitted under any other circumstances. See Fed.R.App.P. 28(a)(3), (4)
 
 
 [4]
 This section of this opinion was prepared by Judge Schnacke
 
 
 [5]
 We have elected to overlook the fact that Valdivia did not object to the question which elicited from Wright the testimony here in question. It was only near the end of the trial that counsel for Valdivia broached the matter by moving to strike this testimony by Wright. The motion was denied. But see Darden v. United States, 405 F.2d 1054, 1055 (9th Cir. 1969); Lambert v. United States, 26 F.2d 773, 774 (9th Cir. 1928)
 
 
 [6]
 Cohn implies that the Government failed to comply with pretrial discovery orders in regard to the Silva information. However, the pretrial orders required the Government to supply all 'statements of witnesses whom the government intends to call at the trial.' Silva was not called as a witness at the trial
 
 
 [7]
 18 U.S.C. 1403 and 21 U.S.C. 174 were repealed, effective May 1, 1971. Pub.L. 91-513, Title III, 1101(a)(2), (4) and (b)(1)(A), 84 Stat. 1291-1292 (1970). Section 1103 of Pub.L. 91-513 contains a savings clause covering any prosecutions commenced prior to May 1, 1971. 84 Stat. 1294 (1970). This prosecution was commenced February 5, 1969
 
 
 [8]
 Harris calls attention to a stipulation entered into between the prosecution and Harris to the effect that the telephone listed to the location where Harris was arrested was not utilized for any telephone calls to the Hernandezes' telephone, nor to any telephone of the alleged coconspirators
 
 
 [9]
 As pointed out in section II of our opinion in the Hernandez Group II appeals, United States v. Murray, et al., 492 F.2d 178 (9th Cir. 1973), we could have declined to consider this question in view of the concurrent sentence rule. However, as in the Group II appeals, we have elected to deal with the point on the merits
 
 
 [10]
 The admission of exhibit 798 was objected to only on the ground that Harris' right of confrontation had been denied. The admission of exhibit 800 was objected to on that ground and on the further ground that it was not shown to be a business record. Exhibits 632-635 and 810-811 were objected to only on search and seizure grounds
 
 
 [11]
 Harris objected to the introduction of exhibit 876 only on the grounds that it was not made in the regular course of business, and that its admission denied defendant his right of confrontation and violated his Fifth Amendment privilege against self-incrimination. He objected to the admission of exhibits 877 through 886 only on the grounds that they were 'prejudicial,' and denied his right to confrontation and privacy. Exhibits 954 and 955 were objected to only on the ground that they violated a court order denying the Government's motion to force the defendants to supply exemplars
 
 
 [12]
 See Tafoya v. Eyman, 455 F.2d 1265, 1267 (9th Cir. 1972); United States v. Washabaugh, 442 F.2d 1127, 1130 (9th Cir. 1971); United States v. Williams, 436 F.2d 1166, 1169 (9th Cir. 1970); United States v. Roustio, 435 F.2d 923, 924 (9th Cir. 1970); Allen v. Rhay, 431 F.2d 1160, 1167 (9th Cir. 1970). But see United States v. Ash, 149 U.S.App.D.C. 1, 461 F.2d 92, cert. granted, 407 U.S. 909, 92 S.Ct. 2436, 32 L.Ed.2d 682 (1972)
 
 
 [13]
 Mrs. Domingue was not the only witness to tie Turner in with the Western Union money orders. The Government's handwriting expert testified that it was highly probable that Turner's handwriting is on both of the money orders