**Robert MATA, Petitioner-Appellant,**

v.

**George SUMNER, Respondent-Appellee.**

**No. 78–2636.**

United States Court of Appeals,
Ninth Circuit.

Dec. 21, 1979.

Rehearing Denied Jan. 31, 1980.

Leonard D. Stein, San Francisco, Cal., argued for petitioner-appellant; Dennis P. Riordan, San Francisco, Cal., on brief.

Jamie Jacobs-May, Deputy Atty. Gen., San Francisco, Cal., for respondent-appellee.

Before ELY and SNEED, Circuit Judges, and TAKASUGI,* District Judge.

* The Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation.

ELY, Circuit Judge:

Robert Mata ("appellant") appeals from the District Court's denial of his Petition for Writ of Habeas Corpus. The Petition followed the appellant's conviction of murder in a California state court and his exhaustion of all available state court remedies.

We reverse the District Court's Order upon the basis of our conclusion that state authorities violated rights given to the appellant by the federal Constitution. First, the pre-trial photographic identification procedure employed by state police was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable in-court misidentification of the appellant. Second, the admission of the in-court identification constituted error of constitutional dimension.

## FACTS

This case involved a homicide at the medium security prison, C.C.I., Tehachapi, California, on October 19, 1972. The prosecution's case was based chiefly on the theory that the homicide was a result of feuding between opposing prison factions—the "Mexican Mafia" and the "Nuestra Family." The homicide victim, Leonard Arias, was represented to have been a member of the "Nuestra Family." Prior to being transferred to Tehachapi, Arias had allegedly attacked a member of the "Mexican Mafia" while at another California prison, San Quentin. As a result of this attack, the "Mexican Mafia" had a "contract" out on the life of Arias. The day after his arrival at Tehachapi, Arias was fatally stabbed.

The prosecution alleged that the appellant and co-defendants Gallegos and Vargas approached Arias and began hitting him. Gallegos stabbed Arias, and one of the three defendants pulled the knife out of Arias' back. One witness, Allen attempted to help Arias, but one of the three defendants jabbed at him, ripping his jacket. Another witness, Almengor, allegedly fought with the appellant, who had a knife.

The facts surrounding the pre-trial photographic identification procedures are set forth below:

*October 19, 1972*

Almengor was shown several hundred photographs of inmates. He selected eight photographs, making a positive identification of Pete Nunez as the person who did the stabbing, and tentatively identifying inmates Ramirez, Reymundo, and Vargas. He did not identify the appellant as a participant. Almengor changed his "positive" identification of Nunez when prison authorities told him that Nunez had been outside the prison on the day of the killing.

Allen was not shown any photographs on October 19th, since he asserted that he could not make any identification.

*October 27, 1972*

Almengor and Allen were shown twenty-four photographs of inmates, including photographs of the three defendants. Outside of Allen's presence, Almengor again tentatively identified the photograph of Vargas. Once again, however, Almengor did not identify the appellant. Moreover, Almengor stated that the photographs were too old and requested more recent ones. Allen was unable to make any identification, and he also complained that the photographs were too old.

*October 27–October 30, 1972*

A series of updated photographs were taken of the defendants and other inmates, but none of the photographs were useable. The photographs of the three defendants were the only ones taken a second time. The defense asserted that when the defendants were taken to be photographed, they were led out of the segregation unit in partial view of Almengor and Allen. It is disputed whether Almengor or Allen actually recognized the defendants as the persons who were to be photographed.

*October 30, 1972*

Almengor and Allen were shown fifteen photographs of inmates. The only updated photographs included were those of the three defendants. Not included in the group of fifteen were the photographs of Ramirez, Reymundo, and Nunez. As indicated, Almengor had previously identified these men as suspects when he had been shown photographs on October 19th. The prosecution's position was that the exclusion occurred because the correctional officers did not consider these inmates as suspects.

In an interview on October 27, 1972, Almengor had described two of the assailants as having mustaches. Six of the fifteen photographs were of inmates wearing mustaches and prison dress. Three of the six photographs were the updated photographs of the three defendants, while the other three photographs were less than a year old. Although taken at different times, most of the photographs in the line-up were similar in terms of size, color, and pose. All of the inmates pictured were of Mexican descent. From these fifteen photographs, Almengor selected those of the three defendants. As indicated above, Almengor had never, prior to this time, identified the appellant. Allen was then brought in, and while Almengor stood on the other side of the room, Allen likewise identified the three defendants. This was the first time that Allen had made an identification of any of the assailants.

The appellant asserted that Almengor was informed by prison officials that he was a suspect because of the discovery, shortly after the murder, of bloodied clothes that belonged to him. Further, it is not disputed that Almengor had asserted throughout much of the identification process that he could not make a positive identification from photographs. The prosecution conceded that Almengor requested a line-up and that this request was refused. No reason for the refusal was given.

In respect to Allen, appellant pointed to the fact that Allen originally stated that he could make no identification. Appellant also asserted that the California Department of Corrections "reminded" Allen of his upcoming parole date and threatened to transfer him, if he failed to cooperate, to another institution, a facility wherein his life would be in danger. Finally, appellant asserted that Allen told one Faulkner, a

private investigator for the appellant, that (1) the incident lasted only a few seconds, and Allen did not get a good enough look at any of the assailants to identify them; (2) throughout the investigation Allen had maintained that he could not identify the assailants, and that he would take a lie detector test to substantiate this; (3) Allen assumed the three defendants must have been the ones who committed the murder because he saw them being taken to be photographed the second time; (4) Allen was due for parole and was under pressure from the Department of Corrections to make an identification.

The prosecution contended that the appearance of the appellant in the updated photograph was significantly different than the original photograph which had been taken three to eight months earlier. Furthermore, the prosecution relied upon Allen's testimony that he had feigned an inability to make an identification because he was attempting to avoid involvement. In addition, the prosecution contended that Allen denied that correctional officers attempted to influence him and repudiated much of what Private Investigator Faulkner had testified that Allen had told him earlier. Finally, the prosecution pointed to evidence that Allen and Almengor did not ascertain the identity of who was being photographed a second time and thus did not "correctly select" the defendants on this basis.

## DISCUSSION

### I.

■■ The presence of counsel is not constitutionally required during a pre-trial photographic display for purposes of suspect identification. *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). Such identification, however, may be challenged as violative of due process when the procedure is unnecessarily suggestive and conducive to irreparable mistaken identification. *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The validity of a photographic identification is to be evaluated in light of the

particular facts and surrounding circumstances of each case. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Calhoun,* 542 F.2d 1094, 1104 (9th Cir. 1976), cert. denied, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977). A conviction "based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . [as a denial of due process] only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. at 971.

■■ Our Circuit has generally followed a two-part approach in determining the admissibility of an in-court identification. *See, e. g., United States v. Valdivia,* 492 F.2d 199, 210 (9th Cir. 1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *United States v. Crawford,* 576 F.2d 794, 797 (9th Cir.), cert. denied, 439 U.S. 851, 99 S.Ct. 157, 58 L.Ed.2d 155 (1978). First, the *necessity* of the photographic identification procedure is considered. *Id.* In this case, appellant was an inmate at the Tehachapi facility and was placed in segregation after the stabbing. It seems quite clear, therefore, that there was no necessity here to use photographic identification procedures. While lack of necessity is not a *per se* ground for rejection of the identification, *see United States v. Calhoun, supra,* 542 F.2d at 1104; *United States v. Valdivia, supra,* 492 F.2d at 210, we have consistently held that necessity is an important factor to be considered in judging the validity of the identification procedures. *See United States v. Peele,* 574 F.2d 489, 490 (9th Cir. 1978); *United States v. Calhoun, supra,* 542 F.2d at 1104; *United States v. Pheaster,* 544 F.2d 353, 370 (9th Cir. 1976), cert. denied, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *United States v. Valdivia, supra,* 492 F.2d at 210; *United States v. Baxter,* 492 F.2d 150, 171 (9th Cir. 1973), cert. denied, 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1974).

The second standard or tier of our court's traditional approach is "whether there was a very substantial likelihood of irreparable misidentification." *United States v. Valdivia, supra,* 492 F.2d at 210. Unnecessary suggestibility alone does not require exclusion of the subsequent identification. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "It is the likelihood of misidentification which violates a defendant's right to due process . : . ." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–382, 34 L.Ed.2d 401 (1972). In other terms, "the focus is on the reliability of the witnesses' identification rather than on the flaws in the pretrial identification procedures." *United States v. Barron,* 575 F.2d 752, 754 (9th Cir. 1978). Several factors have been listed as relevant in the evaluation of the likelihood of misidentification:

> (1) the length of time and the conditions under which a witness was able to observe the perpetrator during the commission of the crime . . ., (2) the similarity of the description given by a witness immediately after the crime to the physical characteristics of the individual he subsequently identifies, (3) conduct on the part of the police tending to focus attention on a particular subject, and (4) presence of other witnesses at the time of the improper identification and the possible prejudicial influence of one witness' opinion on another's recollection. *See Parker v. Swenson,* 332 F.Supp. 1225, 1230–1231 (E.D.Mo.1971).

*United States v. Valdivia supra,* 492 F.2d at 210. *See also United States v. Calhoun, supra,* 542 F.2d at 1104; *United States v. Crawford, supra,* 576 F.2d at 797.

In applying the facts of this case to well established standards, it is obvious that there was a grave likelihood of irreparable misidentification.

According to their testimony, witnesses Almengor and Allen observed the stabbing and actually fought with appellant and one of the co-defendants. This would have at least provided an opportunity for the witnesses to observe the perpetrators of the crime. On the other hand, the violence accompanying the incident and the threat presented by the knife would have, quite likely, diverted the witnesses' attention.·

On October 27, 1972, Almengor told investigating authorities that two of the assailants were dark complexioned and wore moustaches, while the other assailant looked like "an Indian dude." The appellant is of Mexican descent and wore a moustache at the time of the homicide.

Yet, the descriptions of the assailants were clearly not detailed descriptions. *Cf. Neil v. Biggers, supra,* 409 U.S. at 200, 93 S.Ct. 375 (description included assailant's approximate age, height, weight, complexion, skin texture, build, and voice).

As for conduct on the part of the authorities "tending to focus attention on a particular subject," it should first be noted that there was not one, but three different sessions wherein Almengor and Allen were shown photographs. As stated. in *United States v. Higginbotham,* 539 F.2d 17, 23 (9th Cir. 1976), wherein the witness was given a photographic display twice:

> While the repeated showing to a witness of photographic displays for the purpose of identification presents opportunities for abuse and due process problems, when it is shown that the witness was equivocal on the first selection and became firm on a later showing, that rule should not be applied where the witness has been consistently firm.

*See also United States v. Cook,* 608 F.2d 1175 at 1178–79 (9th Cir. June 29, 1979) ("As with all photographic identification procedures, there is a possibility that the prior photo array tainted this later identification.").

Here, Almengor was not merely "equivocal" on the first selection. He selected photos of three individuals whom the prosecution asserts were not involved at all, Allen would not even look at the photos because he said he could not make an identification. The two witnesses made the "correct" selections on the third time around, and only after (1) Almengor's request for a line-up

had been refused,[1] (2) considerable pressure from both the prison officers and opposing prison factions had admittedly been brought to bear on both witnesses, (3) prior "mistaken" selections had been removed, (4) the number of photos had been drastically reduced; and (5) new photos of appellant and co-defendants (and only of these three) had been substituted in the array.[2]

The prosecution argued that the changed appearance of the appellant in the updated photograph accounted for the sudden ability of Almengor and Allen positively to identify the appellant on October 30th. While we have looked at the photographic exhibits and do agree that there is some change in appearance, this fact must be balanced against the totality of circumstances. Based upon the lack of necessity, the diversion of the witnesses' attention at the time the crime was committed, the hazy and very general description of the appellant by Almengor, and the inescapable focusing of attention upon the appellant by the investigating authorities, we are driven to the conclusion that the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Due process of law cannot be predicated on a systematic plan by prison officers to twist a photographic identification procedure in a manner calculated to obtain an identification of one they suspect.[3]

## II.

From our review of the record, including the evidence introduced against the appellant, it is clear to us that the in-court identifications by Almengor and Allen constituted evidence that was of exceptional importance to the prosecution in its achievement of the appellant's conviction. Therefore, we cannot hold that the error in allowing these identifications was harmless be-

---

1. As indicated above, the state authorities offered no reason why Almengor's request for a line-up was denied. Particularly in light of the witnesses' own complaints about the photographic identification procedure, we can only infer that the refusal stemmed from the reluctance of the prison officials to provide appellant with the assistance of counsel which would be required in a line-up procedure.

2. Cf. Simmons v. United States, supra, 390 U.S. at 383, 88 S.Ct. at 971 (The danger of an erroneous identification of a witness "will be increased if the police . . . show [the witness] the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.").

3. Having carefully considered the dissenting opinion, the majority deems it unnecessary to comment on that opinion, except for one portion thereof. The portion reads:
   "Pressure was indispensable in the circumstances of this case if the crime was to be solved reasonably quickly. I repeat, prison officials must operate in a humane manner but also in a fashion that takes into account the realities of prison environment. The officials in this case, in my opinion, merely did what we as citizens demand of them, i. e., protect the inmates by apprehending those who recently had preyed upon one of them."
   The record before us indicates, with unmistakable clarity, that the photographic identification procedures in question were not employed to "protect the inmates by apprehending those who recently had preyed upon one of them." In fact, the appellant had already been quickly apprehended and placed in segregation after the stabbing had occurred. Therefore, the impermissible procedures were utilized so as to assemble incriminating evidence against the appellant in order that the crime be more quickly "solved."
   In the consideration of such a fundamental right as due process, there are, of course, much more treasured values than mere speed and efficiency. See Wolff v. McDonnell, 418 U.S. 539, 583, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (Marshall, J., dissenting); Fuentes v. Shevin, 407 U.S. 67, 90–91 n. 22, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1977). We cannot remain oblivious to the danger, a danger of the severest gravity, that investigating officials, in an effort quickly to solve a crime, may exert such coercive tactics as to lead to the mistaken identification of an innocent individual. Moreover, in the context of prison environment, the guarantee of due process rights is no less important than is that guarantee to society at large. All law abiding citizens share the desire that all crimes be solved with reasonable speed, but speed, in and of itself, cannot justify the infringement of basic constitutional rights. And, it is well established, of course, that a prisoner does not shed his basic constitutional protections when he enters an American prison. See Finney v. Arkansas Board of Corrections, 505 F.2d 194, 211 (8th Cir. 1974) and cases cited therein.

yond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir. 1978). *See also Wilson v. Anderson*, 379 F.2d 330, 335–37 (9th Cir. 1967) (Ely, J., dissenting), *rev'd per curiam, Anderson v. Nelson*, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968). Accordingly, the challenged Order of the District Court is reversed. Upon remand, the District Court will hold the Petition in abeyance for a period of ninety days, within which time California's prosecutors may, if they so choose, initiate a new trial against the appellant, a trial in which prosecutorial evidence barred by the federal Constitution will not be introduced.

REVERSED and REMANDED, with directions.

SNEED, Circuit Judge (dissenting):

I respectfully dissent.

The majority concludes that there was "a systematic plan by prison officers to twist a photographic identification procedure in a manner calculated to obtain an identification of one they suspect"; that there was no necessity to use photographic identification procedures; and that the procedures employed here created a grave likelihood of irreparable misidentification. Fortified by my examination of the photographs employed on October 27, 1972 and October 30, 1972 and the fact that, leaving aside the direct appeal process, three courts of the State of California (Superior Court of Marin County, Court of Appeal, Fifth Appellate District, and Supreme Court of California) and one federal court (District Court, Northern District of California) have failed to discern the "systematic plan" and to reach the conclusions so easily arrived at by the majority, I conclude that the procedures employed did not contravene the *Simmons* test as interpreted by this circuit.

In addition, I suggest that the application of the *Simmons* test in habeas corpus proceedings should be somewhat less rigorous than is the case in direct appeals from federal convictions. That is, the likelihood of irreparable misidentification should be sufficiently clear and convincing in habeas proceedings to require a setting aside of the conviction to prevent manifest injustice. This position involves recognition that a vigorous application of *Simmons* in the direct appeal setting rests, in part, on our supervisory powers rather than exclusively on the command of the Due Process Clause of the Fifth Amendment.

## I. THE SIMMONS' TEST AS USED ON DIRECT APPEAL

In applying *Simmons* as it would be on a direct appeal, the majority concludes much too easily that there was no necessity in this case to use photographic identification procedures. I disagree. The prison setting of the crime for which appellant was convicted and the investigation thereafter by prison officials in my opinion dictate the use of photographic identification procedures. Apparently the majority insists as a matter of constitutional law that there be employed lineups of a large group of inmates, with each suspect, or more likely a substantial group of inmates, which would include the suspects, suitably equipped with counsel, in lieu of photographic identification procedures. *See* p. 759 n. 1. To state the requirement reveals its impracticability. Moreover, it would impose heavy demands on the staff, strain employee relations, and expose the inmates to increased risks of bodily harm.

The prison world is unique. It differs enormously even from the precinct stationhouse and police headquarters. A "code of silence" strengthened by taboos against "ratting" and a pervasive fear of retaliation are characteristics of the prison social order. In this environment prison administrators and guards must function. Administrators are responsible for protecting prisoners in their custody and may be held liable for a failure to provide such protection. *See, e. g., Sostre v. McGinnis*, 442 F.2d 178, 205 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Bennett, *Who Wants To Be Warden?*, 1 New England J.Prison L. 69, 69–70 (1974). Guards, directly responsible for prison order and

security, jealously husband their stock of authority and seek to avoid any confrontation that will deplete that stock. *See* National Institute of Law Enforcement and Criminal Justice, Prison Employee Unionism: The Impact on Correctional Administration and Programs 24–25 (1978). To require the type of lineup the majority envisions in this setting is to insist upon jeopardizing the security and safety of all as the price of securing the constitutional protection that the majority holds appellant is entitled. We should be reluctant to fashion constitutional doctrines whose price is so dear.

In any event, necessity, or the lack of it, constitutes but part of the *Simmons* test. *United States v. Crawford*, 576 F.2d 794, 797–8 (9th Cir.), *cert. denied*, 439 U.S. 851, 99 S.Ct. 157, 58 L.Ed.2d 155 (1978). The strength of the majority's position rests on the exertion of pressure by prison authorities on Almengor and Allen and the use of three photographic spreads in the manner described. Pressure was indispensable in the circumstances of this case if the crime was to be solved reasonably quickly. I repeat, prison officials must operate in a humane manner but also in a fashion that takes into account the realities of prison environment. The officials in this case, in my opinion, merely did what we as citizens demand of them, *i. e.*, protect the inmates by apprehending those who recently had preyed upon one of them.

The record of this case does not include the several hundred photographs shown to Almengor on October 19, 1972. The spreads of October 27 and 30, 1972, are included, however. So different is the appellant's photograph used in the October 27 spread from that of October 30 that it is difficult to accept the fact that the appellant appeared in the October 27 spread at all. Nonetheless, I must accept that fact because both appellant and appellee agree that the appellant's photograph did appear in the October 27 spread. It remains true, however, that any failure to select the appellant's photograph in the October 27 spread may be attributable to the fact that it bore little resemblance to the appellant's

appearance at the time of the murder of Arias.

The spreads of October 27 and 30, therefore, are not impermissibly suggestive on their face. Nor are they made so by the absence of the photographs of Ramirez, Reymundo, and Nunez. The range of choice available to Almengor and Allen remained large. Also, contrary to the majority's characterization is the weight that must be given to Almengor's description of the assailants of Arias and the consistency with which Vargas, one of the assailants, was identified. Admittedly the uncertainty surrounding Allen's motivations prior to his identification of the appellant compels us to review carefully the way in which the spreads were used. Allen's behavior, however, is consistent with an effort to avoid entanglement until his identification would yield the largest possible return to him. While such an attitude is not particularly noble, it is precisely the state of mind most prisoners would have under similar circumstances. In any event, I find it impossible to attribute his identification of appellant's photograph to an impermissibly suggestive use of photographic spreads. That Allen was subjected to official and unofficial pressures I do not doubt; but the *Simmons* rule should not be distorted to enable us to condemn on constitutional grounds the inescapable use of such pressures in an investigation of a murder in a prison setting. Interpretations of our supervisorial powers or of the Constitution which ignore the realities of the environment within which they function bring discredit to both the courts and the Constitution.

## II. COLLATERAL REVIEW AND SIMMONS

Should I be wrong about the application of *Simmons* to the facts of this case were it before us on direct appeal, I maintain that *Simmons* should be applied in habeas corpus proceedings so as to overturn convictions only in the case where clear and convincing evidence demonstrates that reversal is required to prevent manifest injustice. To so

limit *Simmons* in habeas proceedings is in keeping with the scope the remedy historically has been given. *See Stone v. Powell*, 428 U.S. 465, 475, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); Oaks, Legal History in the High Court—Habeas Corpus, 64 Mich.L. Rev. 451 (1966). Although the scope of habeas relief has been expanded, it has remained a remedy for exceptional cases: "It is of the historical essence of habeas corpus that it lies to test proceedings so fundamentally lawless that imprisonment pursuant to them is not merely erroneous but void." *Fay v. Noia*, 372 U.S. 391, 423, 83 S.Ct. 822, 840, 9 L.Ed.2d 837 (1963).

To apply *Simmons* in habeas proceedings to instances of manifest injustice requires recognition that "impermissible suggestiveness" for purposes of collateral review of state convictions rests on an interpretation of due process, assured by the Fifth and Fourteenth Amendments, that may not exhaust the full reach of *Simmons* which, it must be remembered, arose from a direct appeal from a federal conviction. Mr. Justice Harlan, speaking for the Court, recognized that, in fashioning the *Simmons* standard, supervisorial powers, rather than constitutional commands, also could be the source of the Court's authority. 390 U.S. at 384, 88 S.Ct. 967. Limitation of *Simmons* in collateral review to "suggestiveness" so flagrant as to result in manifest injustice merely recognizes that the dictates of due process are somewhat less far reaching than are the supervisorial powers of federal courts over federal law enforcement officials. The existence of this difference appears to me to be neither unreasonable nor inconsistent with *Simmons*. It must be admitted that the distinction I suggest has not been utilized by the Supreme Court. *See Neil v. Biggers*, 409 U.S. 188, 196–09, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 121–22, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (J. Marshall dissenting); Pulaski, *Neil v. Biggers: The Supreme Court Dismantles the Wade Trilogy's Due Process Protection*, 26 Stan.L.Rev. 1097, 1106–09 (1974); *but see* Comment, *Photographic Identification: The Hidden Persuader*, 56 Iowa L.Rev. 408, 425–26

(1970). Nor has this circuit employed it. *See United States v. Allison*, 414 F.2d 407, 409 (9th Cir.), *cert. denied*, 396 U.S. 968, 90 S.Ct. 449, 24 L.Ed.2d 433 (1969); *United States v. Baxter*, 492 F.2d 150, 170–71 (9th Cir.), *cert. dismissed*, 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *United States v. Jones*, 512 F.2d 347, 351 (9th Cir. 1975); *cf. United States v. King*, 433 F.2d 937, 938 (9th Cir. 1970), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1681, 29 L.Ed.2d 142 (1971) (the court quoted Mr. Justice Harlan's opinion that the Supreme Court has both supervisory and constitutional powers of review).

Also, *Stone v. Powell, supra*, while useful as an analogy, does not precisely justify my position because there the evidence admitted in the state proceedings in no way could be thought to have been "created" by improper official conduct. Its admissibility might be barred because of an improper search and seizure, but its genuineness and probity could not be questioned. Here the situation is different. In court identifications carry some taint whenever any non-frivolous issue regarding the use of photographic spreads is raised. The taint, moreover, puts in issue the truth of the in court identification. It follows, therefore, that the balancing process employed by the Court in *Stone v. Powell*, in which the utility of the exclusionary rule is weighed against the costs of extending it to collateral review, is not applicable here. A different approach must be employed, one in which the constitutional standard employed in collateral review is somewhat less demanding than the supervisorial standard employed on direct appeal.

Notwithstanding the inapplicability of *Stone v. Powell*'s balancing process, it remains true that its emphasis upon the opportunity for full and fair litigation in the state courts is equally applicable here. 428 U.S. at 494, 96 S.Ct. 3037. This opportunity to litigate an issue as imprecise as "impermissible suggestiveness" in the state courts strongly suggests that collateral review by federal courts frequently is redundant. Re-

petitive collateral review employing a standard so amorphous more resembles a game of chance than it does the wise administration of criminal justice. To so employ the Great Writ is to corrupt, not enhance it. *See Sneckloth v. Bustamonte*, 412 U.S. 218, 275, 93 S.Ct. 2041, 36 L.Ed.2d 854 (Powell, J., concurring). I would affirm the district court.