542 F.2d 1094
 UNITED STATES of America, Plaintiff-Appellee,
v.
Darrell CALHOUN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Andrew SHEPPARD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joe T. HARRIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James E. ELLIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Clifford BURSTON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James William WIMBLEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Calvin STEPHENSON, Defendant-Appellant.
 Nos. 75-1519, 75-1376, 75-2904, 75-1541, 75-1493, 75-1492
and 75-1368.
 United States Court of Appeals,
Ninth Circuit.
 Sept. 24, 1976.
Rehearing Denied in No. 75-1519 Nov. 4, 1976.
 
 S. G. Jackson, Jr., Deputy Federal Public Defender (argued), Los Angeles, Cal., for Wimbley.
 Arthur Mabry, Los Angeles, Cal., for Sheppard.
 Leonard C. Kohn, Los Angeles, Cal., for Calhoun.
 Alan Fenster (argued), Beverly Hills, Cal., for Harris.
 Ron Minkin, Los Angeles, Cal., for Ellis.
 David Elson (argued), Murphy, Thornton, Hinerfeld & Cahill, Los Angeles, Cal., for Burston.
 Donald B. Marks (argued), Beverly Hills, Cal., for Stephenson.
 Ronald Munteau (argued), Los Angeles, Cal., for plaintiff-appellee.
 Before WRIGHT and CHOY, Circuit Judges, and ORRICK,* District judge.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 Seven co-defendants were convicted of conspiracy to distribute heroin (21 U.S.C. §§ 841(a)(1) & 846). All but Sheppard and Wimbley were convicted also of possession of heroin (21 U.S.C. § 841(a)(1)). On appeal, they raise a multitude of issues. We affirm as to all except Sheppard and Wimbley.
 
 I.
 FACTUAL BACKGROUND
 
 2
 Appellants were under investigation by Los Angeles police and the Drug Enforcement Administration (DEA) from August 1, 1973 until March 10, 1974. Investigation focused on a suspected heroin importation ring headed by Vernard Harris. During the months of investigation appellants had been seen going to San Diego, apparently to purchase drugs, and engaging in other suspicious activity.
 
 
 3
 These observations, together with information supplied by confidential informants, led to the issuance of a court authorized wiretap on the telephones of Vernard Harris. On March 7, a person identifying himself as Raul called the Harris home. When told that Vernard was not at home, he left a message that he could be reached at a number in Mexico. Based on the information already acquired, the officers concluded that the call signified that a drug transaction was imminent, and intensified surveillance.
 
 
 4
 About 5:00 A.M. on March 8, Wimbley and two others drove to 1131 Alta Loma, the Los Angeles apartment complex in which Calhoun and Joe Harris resided. Some time that morning, Calhoun, Ellis, and two women drove in a limousine to a San Diego hotel. They later rented another car. Sheppard also checked into the hotel. Wimbley, too, went to San Diego on that date, then returned at once to Los Angeles.
 
 
 5
 On March 9, Calhoun, Ellis, the two women and Sheppard left the San Diego hotel and arrived at 1131 Alta Loma at 6:30 P.M. in the rented car. Ellis removed from the trunk of the car a suitcase later determined to contain four pounds of heroin and four pounds of procaine. Stephenson, with a handgun in his waistband, Joe Harris, with his hand under his coat in a manner suggesting that he carried a gun, Burston, and an unidentified man acted as lookouts and guards while Ellis moved the suitcase into the building.
 
 
 6
 In the early morning of March 10, a search warrant issued for Calhoun's apartment was executed by the officers who, upon entering, exchanged shots with those inside. Vernard Harris was killed and Calhoun wounded. The search produced the heroin-laden suitcase and other incriminating evidence.
 
 
 7
 At the time of the raid on Calhoun's apartment, a DEA agent saw and arrested Joe Harris leaving his apartment located in the same building. Having been advised of his Miranda rights, Harris consented to a search of the apartment. Two five pound boxes of mannitol, a chemical often used to dilute heroin, were discovered.
 
 
 8
 Other law enforcement officers went to 733 North Kings Road and the apartments of Wimbley and Sheppard. They obtained keys from the manager and entered without announcing their purpose. They received permission to search Wimbley's apartment and discovered implements often used in the distribution of narcotics. On entering Sheppard's apartment, they were unable to find him but did discover twenty pounds of mannitol in a closet.
 
 II.
 THE WIRETAP
 
 9
 Appellants Calhoun, Ellis, and Sheppard challenge the legality of the court- ordered wiretapping of the telephones at Vernard Harris' residence. Because none of the appellants has standing to challenge the wiretaps, we do not reach the merits of their arguments.
 
 
 10
 In Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Court held that a defendant may move to suppress the fruits of a wiretap only if he was a party to the intercepted conversation or if it occurred on his premises. See also United States v. King, 478 F.2d 494 (9th Cir. 1973).
 
 
 11
 None of the appellants fulfills either requirement. The telephones tapped were on the premises of Vernard Harris. The conversations involved persons calling themselves "Raul" and "George." We conclude that appellants lack standing to argue the invalidity of the court-ordered wiretap.
 
 III.
 IDENTITY OF INFORMANTS
 
 12
 Appellants Harris and Wimbley sought unsuccessfully to require disclosure of the identities of informants who supplied information used both in the application for the wiretap and in the application for a search warrant for the Calhoun apartment. Neither appellant has standing to challenge the interception or the search.
 
 
 13
 Moreover, even if we were to reach the merits of their contention, it is apparent that neither has met his burden of showing a need for disclosure. United States v. Marshall, 526 F.2d 1349, 1359 (9th Cir. 1976); United States v. Alvarez, 472 F.2d 111, 113 (9th Cir. 1973); United States v. Kelly, 449 F.2d 329, 330 (9th Cir. 1971). The trial court did not abuse its discretion in denying these motions. United States v. Edwards, 503 F.2d 838, 840-41 (9th Cir. 1974).
 
 IV.
 SEARCH OF CALHOUN APARTMENT
 
 14
 Appellants Calhoun, Ellis, Harris and Stephenson contend that the evidence seized from the Calhoun apartment in the search by DEA agents and LAPD officers should have been suppressed. They claim that the search warrant was invalid in that the information submitted to the magistrate at the time of the warrant's issuance did not provide probable cause. We conclude that the district court properly denied the suppression motion. In so doing, we note that only Calhoun has standing to contest the search and seizure. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); United States v. Epperson, 528 F.2d 48 (9th Cir. 1975).
 
 
 15
 We are, of course, limited to an examination of the allegations contained in the documents submitted to the magistrate in support of the search warrant. Aguilar v. Texas, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Probable cause exists when the affidavits give sufficient information to lead a reasonably cautious person to conclude that the items sought are located at the place to be searched. Berger v. New York, 388 U.S. 41, 55, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).
 
 
 16
 In reviewing the affidavits of several law enforcement officers supporting the search warrant, we are mindful of the language of the Supreme Court:
 
 
 17
 (W)here these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.
 
 
 18
 United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).
 
 
 19
 The lengthy affidavits in support of the search warrant provide extensive details from which a magistrate could conclude that probable cause existed to search Calhoun's apartment. The information was of several types: descriptions of suspicious activities involving Calhoun and others observed by law enforcement officers over a period of months; statements of several informants that Vernard Harris and Calhoun were involved in drug traffic; statements of persons who had been arrested and charged with possession of heroin that Vernard Harris had supplied them with drugs; telephone records and observations of police officers associating Calhoun with Vernard Harris; and details of the events of March 9, from which it was reasonable to infer that drugs had been transferred to Calhoun's apartment. On the basis of the information, there was ample support for the magistrate's conclusion that probable cause for a search existed.
 
 
 20
 Calhoun also asserts that the fruits of the search should have been suppressed because the affidavit of a government agent, submitted in support of the search warrant, contained a number of inaccuracies. These do not require suppression for two reasons: they were neither material to a determination of probable cause nor were they intentional. United States v. Prewitt, 534 F.2d 200, 202 (9th Cir. 1976).
 
 
 21
 Appellant Calhoun expressly disavows any allegation that the inaccuracies were intentional misrepresentations. Therefore, if the evidence seized is to be suppressed, inaccuracies must have been material to the probable cause determination. Prewitt, supra, at 202.
 
 
 22
 A summary of the alleged inaccuracies demonstrates their immateriality:
 
 
 23
 (1) The affidavit relates observations of appellants by Officer Woempner which suggest criminal activity. It appears from the affidavit that Woempner communicated directly with the affiant when in fact the contact was only indirect.
 
 
 24
 (2) Affiant related that Officer Woempner knew that a conversation had occurred between "Calhoun, Harris' brother and the man from the Rolls Royce," because he heard voices from just outside the Calhoun apartment. Actually, Woempner was in a truck parked in front of the building and heard the voices and saw the participants in Calhoun's apartment.
 
 
 25
 (3) The affiant stated that, during the alleged transfer of heroin to Calhoun's apartment, two men drove up and immediately assumed lookout positions near the car carrying contraband. If fact, Woempner reported that the two individuals entered the apartment building for a short time before assuming the lookout positions.
 
 
 26
 (4) The affiant stated the the lookouts had bulges in their waistbands, indicating possession of handguns. In fact, Woempner saw a gun in the waistband of only one lookout. He reported that the other man carried his hand under his coat, suggesting that he carried a handgun in a shoulder holster.
 
 
 27
 (5) The affiant stated that the alleged contraband was transferred from the car to Calhoun's apartment by Calhoun. Woempner in fact reported that appellant Ellis was the transferor.
 
 
 28
 (6) Finally, affiant stated that a transfer of what appeared to be "money" bags was made by Vernard Harris' brother from the building to a waiting limousine. Actually, Woempner had reported that the transfer was made by appellant Ellis, not Harris' brother. Moreover, the transfer was made from another car and not from the apartment building.
 
 
 29
 All of this, if stated in the affidavit in accordance with Officer Woempner's later statements, would not have affected the issuance of the warrant. If anything, it would give added support to the conclusion that probable cause to search existed. Moreover, even if we believed the inaccuracies material, although unintentional, we might still uphold the warrant and the resultant seizures on the basis of its unchallenged contents which, standing alone, provide an ample basis for a finding of probable cause to search. Cf. United States v. Damitz, 495 F.2d 50, 55 (9th Cir. 1974).
 
 
 30
 We also reject Calhoun's contention that even if individual inaccuracies do not require suppression, their cumulative effect does. The lack of materiality of each inaccuracy does not disappear when they are combined. And, given the nature of the discrepancies, we cannot accept the argument that these inaccuracies suggested that the magistrate should not have believed the other statements contained in the affidavits.
 
 V.
 ARREST AND SEARCH OF JOE HARRIS
 
 31
 Before the search of Calhoun's apartment at 1131 Alta Loma, Agent Mueller was instructed to take a position in the hallway near appellant Joe Harris' apartment, also located at 1131 Alta Loma. While there, he observed Harris leave apartment 517 at approximately 4:00 A.M., shortly after gunfire was heard in the Calhoun apartment. Mueller, having been instructed to make an arrest if Harris attempted to leave, arrested him as he stood in the hallway of the apartment, 50 feet from the doorway to apartment 517.
 
 
 32
 Harris was handcuffed and escorted to the door of his apartment. When asked if anyone were inside, he replied that his girl friend was there and that the agents could enter, which they did. Harris and his friend, Rhonda Black, were then advised of their Miranda rights.
 
 
 33
 Officer Mueller asked Harris to permit a search of the apartment. Harris agreed and Mueller reminded him that his consent or a warrant was required before a search could be undertaken. Harris again gave approval to search. Two boxes of mannitol were discovered in a clothes hamper in Harris' bedroom.
 
 
 34
 Harris, unsuccessfully sought to suppress this evidence, contending that Mueller did not have probable cause to arrest him; that, regardless of the legality of the arrest, the consent to search the apartment was not voluntarily given; and that, despite its discovery, the agents did not have probable cause to seize the mannitol.
 
 
 35
 We note first that Harris does not challenge the arrest because it was made without a warrant. Nor could he. The hallway of an apartment building, as with the threshold of one's dwelling, is a "public" place for purposes of interpreting the Fourth Amendment. United States v. Santana, --- U.S. ----, 96 S.Ct. 2406, 49 L.Ed. 300 (1976). Consequently, a warrantless arrest was proper. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 514 (1976).
 
 
 36
 Mueller neither observed Harris engaged in criminal activity nor did he know the facts underlying the determination that probable cause to arrest existed. But such a determination had been made. Those in charge of the investigation, who had given Mueller his orders, had reason to believe prior to Harris' arrest that there existed a conspiracy to import heroin. Harris had been linked with the conspiracy by his role as a guard during the transfer at Calhoun's apartment.
 
 
 37
 We agree with the district court that this established probable cause. Under the circumstances, the fact that the arresting officer did not personally have probable cause does not invalidate the arrest. See Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); United States v. Robinson, 536 F.2d 1298 (9th Cir. 1976).
 
 
 38
 Harris next contends that, regardless of the legality of his arrest, the mannitol seized without a warrant was the product of an illegal search. The government counters that Harris voluntarily consented to the search.
 
 
 39
 Voluntariness is to be determined from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We must decide whether the district court's factual determination that Harris voluntarily consented to the search was clearly erroneous. United States v. Rothman, 492 F.2d 1260, 1264 (9th Cir. 1973); United States v. Page, 302 F.2d 81, 85 (9th Cir. 1962) (en banc).
 
 
 40
 Although appellant had been arrested at gunpoint prior to the request for permission to search, several considerations support the court's determination. The arrest of an individual, while an important factor, does not foreclose a finding of voluntariness. Rothman, supra at 1264 n. 1. Here, Harris was given Miranda warnings prior to his consent. United States v. Heimforth, 493 F.2d 970, 972 (9th Cir. 1974). He was also told that he need not consent. Schneckloth, supra at 249, 93 S.Ct. 2041. Viewed in context, we conclude that the district court's determination that appellant's consent was voluntarily given was not clearly erroneous.
 
 
 41
 While searching the apartment the agents discovered two boxes in the clothes hamper. Harris contends that they were improperly seized, as the officers lacked reason to believe that they were evidence of a crime. We recognize that there must be:
 
 
 42
 a nexus . . . between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.
 
 
 43
 Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967).
 
 
 44
 The agents who searched the apartment were investigating a heroin distribution ring. When, in the course of searching the quarters of a suspected participant they observed boxes in a clothes hamper, they had reason to be suspicious. When it was determined that the boxes were labelled mannitol, a cutting agent often associated with the distribution of heroin, a sufficient link was established between the boxes and the criminal behavior under investigation to justify the seizure. See United States v. Jones, 518 F.2d 384, 388-89 (7th Cir. 1975).
 
 VI.
 WIMBLEY'S ARREST AND SEARCH
 
 45
 Appellant Wimbley was arrested in an apartment at 733 North Kings Road an hour after the execution of the search warrant for Calhoun's apartment. Eight officers possessing neither an arrest nor a search warrant entered the apartment unannounced, with guns drawn, having obtained keys from the manager. They found Wimbley reading in bed, arrested and handcuffed him. He was subsequently advised of his Miranda rights.
 
 
 46
 Wimbley contends there was no probable cause for his arrest in his home at night without a warrant. The government counters that there was probable cause and exigent circumstances which required immediate action.
 
 
 47
 We agree that there was probable cause to arrest. The observations of the officers for several months and the information supplied by informants directly connected Wimbley with the conspiracy.
 
 
 48
 After his arrest, the agents and Wimbley moved to the living room where the agents asked permission to search the apartment, telling Wimbley that either his permission or a search warrant would be required. Wimbley replied: "Go ahead and search there's no narcotics here that I know of." (R.T. 2368). The agents found paraphernalia associated with the distribution of heroin.
 
 
 49
 Wimbley contends that these should have been suppressed as the fruit of an illegal arrest. The government argues that the arrest was legal, exigent circumstances precluding the opportunity to procure a warrant; and even if the arrest were illegal, the government asserts, the evidence was uncovered after Wimbley's voluntary consent to search. Wimbley denies that the consent was voluntary.
 
 
 50
 Again, we apply the "totality of the circumstances" test set forth in Schneckloth to determine whether the district court's determination that Wimbley voluntarily consented to the search was clearly erroneous. Rothman, 492 F.2d at 1264.
 
 
 51
 Appellant was under arrest and handcuffed and the request to search came during the middle of the night. Before the request, Wimbley had faced drawn guns of several officers. His wife was handcuffed in an adjoining room and the agents testified that the atmosphere in the apartment was tense.[1] On the other hand, Wimbley was advised of his Miranda rights and he gave permission to search only after being told that he need not do so.
 
 
 52
 Viewing the "totality of the circumstances" that surrounded the search request and Wimbley's response, we conclude that the district court's determination that Wimbley voluntarily consented was clearly erroneous and the evidence resulting from the search should have been suppressed.
 
 VII.
 THE ENTRY INTO SHEPPARD'S APARTMENT
 
 53
 After arresting Wimbley, the officers proceeded to Sheppard's apartment in the same building. With a passkey, they entered without a warrant to arrest Sheppard, who was not there. During the search for him, the officers found four boxes of mannitol in a closet.
 
 
 54
 Sheppard argues that his warrantless arrest in his home at night lacked probable cause. The government responds that probable cause was present and the exigency of the situation required immediate action by the agents.
 
 
 55
 Once again, we agree there was probable cause to arrest. Not only had Sheppard been under surveillance for several months and connected to the conspiracy through informant's information, but also the discovery of heroin in the search of Calhoun's apartment earlier that night strengthened the conclusion that probable cause existed.
 
 
 56
 The validity of the entry in the absence of a warrant is more difficult. Both sides apparently agree that absent exigent circumstances, the entry would be illegal. The government contends that once they had raided Calhoun's apartment there was the distinct possibility that other conspirators would hear of the raid and attempt to flee. Fear that a suspect will escape is an exigent circumstance. United States v. Curran, 498 F.2d 30, 35-36 (9th Cir. 1974). But if it is created by the law enforcement officers, it will not support a warrantless search. Curran, supra at 34. Davis v. United States, 327 F.2d 301, 306 (9th Cir. 1964).
 
 
 57
 Entry into the Sheppard apartment was not justified without a warrant and the mannitol seized in that entry should have been suppressed. While it is possible that Sheppard might have discovered the presence of the officers in the building and attempted to flee, nothing in the record indicates it was more likely here than in any case where there are two or more suspects and all are not arrested at once. The availability of an alternative further suggests that exigent circumstances did not exist. There were sufficient officers in the area that, instead of entry, they might have maintained surveillance while a warrant was sought. See United States v. Bustamante-Gamez, 488 F.2d 4, 8-9 (9th Cir. 1973).
 
 
 58
 Moreover, even if we were to find exigent circumstances, we would have difficulty with the manner in which they arose. A search warrant for Calhoun's apartment had been obtained only hours before the entry into Sheppard's. It is not apparent why arrest warrants, including one for Sheppard, were not sought or obtained then. We recognize that the officers were not bound to seek warrants as soon as they established probable cause. Watson, 423 U.S. at 431, 96 S.Ct. 820 (Justice Powell, concurring). But this does not foreclose consideration of such decisions in determining whether the exigency in fact existed and whether it was created by the actions of the officers.
 
 
 59
 Finally, we note that the alleged exigency in this case was a foreseeable result of the search of Calhoun's apartment. Having decided not to seek additional warrants at the time they requested the warrant for Calhoun's apartment, they cannot rely on the foreseeable consequences of that decision as a justification for a warrantless entry of a residence in the nighttime to effect an arrest. The evidence seized in Sheppard's apartment should have been suppressed.
 
 VIII.
 THE JURY
 
 60
 Appellant Harris urges that the trial judge erred during voir dire in excusing two jurors for cause on his own motion. In each instance, the judge outlined the reasons for his belief that the veniremen might be unable to give both sides a fair trial. A trial judge has broad discretion in this area which will not be reversed absent clear abuse. United States v. Rodriguez,459 F.2d 983, 984 (9th Cir. 1972); United States v. Bailey, 468 F.2d 652, 658 (5th Cir. 1972), affirmed on other grounds, 480 F.2d 518 (5th Cir. 1973) (en banc). There has been no abuse of discretion.
 
 
 61
 Moreover, regardless of the propriety of excusing two veniremen, we would not be inclined to reverse. A defendant is entitled to an array of impartial jurors to whom he may direct his peremptory challenges but, having been provided with such a panel, he suffers no prejudice if a juror, even without sufficient cause, is excused by the court. United States v. Puff,211 F.2d 171, 184-85 (2d Cir. 1954). See Vesely v. United States, 276 F. 693, 695 (9th Cir. 1921).
 
 
 62
 Appellants Sheppard and Harris also challenge the government's use of peremptory challenges against three black veniremen. They contend that, as a result of the challenges, the jury which convicted was all white and not composed of their peers. A criminal defendant, however, is not constitutionally entitled to have a proportionate number of his race on the jury which tries him. Swain v. Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); United States v. Gonzalez, 456 F.2d 1067, 1068 (9th Cir. 1972). There being no proof of systematic discrimination, appellants' claim must fail. Swain, supra, 380 U.S. at 226, 85 S.Ct. 824. Appellants did not meet this burden.
 
 IX.
 JENCKS ACT MATERIAL
 
 63
 Three appellants claim error in the trial court's refusal to require production of surveillance notes made by several police officers who later testified. Appellants contend that they were entitled to the notes under the Jencks Act. (18 U.S.C. § 3500).
 
 
 64
 Appellant Burston sought the notes of Officers Stanley, Woempner, and Murphy concerning the events of March 9 at 1131 Alta Loma Drive. Officer Stanley testified that he was at the command post during this period and made notes of transmissions from Woempner and Burston. But Stanley did not testify to the events at 1131 Alta Loma on that date. His notes, therefore, are not covered by the Jencks Act. (18 U.S.C. § 3500(b)).
 
 
 65
 Although Woempner and Murphy did testify to events observed at 1131 Alta Loma, Stanley's notes made at the command post from their transmissions still do not qualify as Jencks Act "statements." 18 U.S.C. § 3500(e) requires that the witness' statement be either written and adopted by him or be a substantially verbatim and contemporaneous recording of an oral statement by the witness. There is no evidence that any command post notes made by Officer Stanley were ever approved by Woempner or Murphy or that the transmissions by these officers were recorded verbatim. Their production was not required.
 
 
 66
 Officers Woempner and Murphy also made notes of their observations of 1131 Alta Loma Drive on March 9. Appellant Burston unsuccessfully sought those. Regardless of the merits, the district court's determination can be no more than harmless error. See Killian v. United States, 368 U.S. 231, 240-44, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961); United States v. Carrasco, 537 F.2d 372 (9th Cir. 1976).
 
 
 67
 The officers testified that they ceased taking notes before the arrival of appellant Burston at 1131 Alta Loma. Production of the notes would not have been useful in cross-examination of the officers about Burston's actions on that date. Their non-production was no more than harmless error.
 
 
 68
 Appellant Stephenson sought the surveillance notes of several police officers who observed and subsequently testified about the so-called "monte carlo incident." But testimony was stricken by the court for lack of relevance and Stephenson may not complain of the non-production of the notes dealing with the incident.
 
 
 69
 Finally, appellant Wimbley contends that the testimony of Officer Forresta about Wimbley's trip to San Diego on January 11, 1974 should have been suppressed for failure to produce the officer's surveillance notes. At trial, the government was unable to locate them and the district court denied the motion.
 
 
 70
 Even if we were to conclude that the lost notes were Jencks Act material and that the testimony should have been stricken, we are persuaded that any failure to comply with the Act resulted in harmless error. Lewis v. United States, 340 F.2d 678, 684 (8th Cir. 1965). Appellant Wimbley's guilt was established beyond a reasonable doubt by competent evidence other than Forresta's testimony about the January 11 trip.
 
 X.
 PRE-TRIAL PHOTO IDENTIFICATION
 
 71
 Appellant Stephenson contends that the court erred in failing to exclude the testimony of LAPD Officer Murphy who identified Stephenson as a participant in the alleged criminal activities of March 8 and 9. He asserts this testimony was given after an impermissibly suggestive pre-trial identification procedure and that reversal is required under Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).
 
 
 72
 We evaluate this claim in light of surrounding circumstances. United States v. Valdivia, 492 F.2d 199, 209 (9th Cir. 1973). Simmons prescribes examination of two considerations in determining whether pre-trial photo identification is impermissibly suggestive. First, was its use necessary? Although the record does not answer this question directly, we assume from the fact that Stephenson had been arrested well before the use of the photo spread that it was unnecessary. This is not, however, a per se ground for reversal. Valdivia, 492 F.2d at 210.
 
 
 73
 The second consideration set forth in Simmons is whether there was a substantial likelihood of irreparable misidentification. Four factors outlined by this court may be relevant to this determination:
 
 
 74
 (1) The length of time and the conditions under which the witness observed the accused.
 
 
 75
 (2) The conduct of the law enforcement officers which may have focused attention on a single suspect.
 
 
 76
 (3) Presence of other witnesses at the time of the challenged identification and the prejudicial effect of one witness' opinion on another's recollection.
 
 
 77
 (4) The similarity of description given by the witness immediately after the crime to the characteristics of the individual whom the witness later identifies. Valdivia, 492 F.2d at 210.
 
 
 78
 Murphy, an experienced law enforcement officer, had an opportunity to observe Stephenson on both days for more than a half hour. He was subsequently presented with a photo spread of nine photographs, one of which was that of Stephenson. Five pictures were of other defendants in this case. This procedure does not suggest that the law enforcement officers unduly focused the witness' attention on a single suspect. No other witness was present at Murphy's identification and there was therefore no improper effect on the recollection of the other witness, Officer Woempner. The fourth factor is inapplicable to this appeal.
 
 
 79
 We conclude that Stephenson has failed to show that the photograph identification procedure used in identifying him was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.
 
 XI.
 TRIAL COURT'S COMMENTS
 
 80
 Stephenson complains of prejudice which may have resulted from the judge's reference to "nonsense," directed at defense counsel during the trial. The comment occurred during the identification by a defense witness of an in-court spectator. The identification corroborated Stephenson's alibi defense.
 
 
 81
 The defense attorney asked that the court excuse this "witness" (meaning the in-court spectator) after he had been identified. The judge responded that the person was not a witness but a spectator and there was, therefore, no need to excuse him. The court then made the remark:
 
 
 82
 Do you (to defense attorney) wish to approach the side bench or do you want this nonsense to continue to go on before the jury? (Emphasis added). R.T. 2227-2228.
 
 
 83
 We note the trial court "must be ever mindful of the sensitive role it plays in a jury trial and avoid even the appearance of advocacy or partiality." United States v. Harris, 501 F.2d 1, 10 (9th Cir. 1974). See also United States v. Malcolm, 475 F.2d 420, 427-28 (9th Cir. 1973).
 
 
 84
 Nonetheless, upon reviewing the comment in the perspective of the trial as a whole, Ochoa v. United States, 167 F.2d 341, 344 (9th Cir. 1948), we find it was of insignificant effect. When reviewed in context, it is apparent that the court directed its comment at the method used by counsel and not at defense counsel or the testimony of the defense witness. Moreover, prior to deliberation the court instructed the jury that it alone was the sole judge of the weight and effect of the evidence and the credibility of the witnesses. This admonition would have cured any prejudice which might have resulted from the court's comment. United States v. Marshall, 526 F.2d 1349, 1362 (9th Cir. 1975).
 
 XII.
 SUFFICIENCY OF THE EVIDENCE
 
 85
 Appellants Wimbley, Harris, Stephenson and Burston assert the evidence was insufficient to support their convictions. After reviewing the lengthy trial transcript we disagree. We discuss only the sufficiency of the case against Burston.
 
 
 86
 He was convicted both of conspiracy to distribute and of possession of heroin. As he was given identical sentences on each count, we need not review both. United States v. Jones, 446 F.2d 12 (9th Cir. 1971). In reviewing the conspiracy count, the evidence must be viewed in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We must determine whether the evidence at trial allowed the jury rationally to conclude that the defendant was guilty beyond a reasonable doubt. United States v. Gardner, 475 F.2d 1273, 1275 (9th Cir. 1973).
 
 
 87
 "Once it is shown that a conspiracy exists, only slight evidence is required to connect a defendant with it." United States v. Westover, 511 F.2d 1154, 1157 (9th Cir. 1975). Here, the evidence of a conspiracy was substantial and, while the only evidence linking Burston to it focused on his activities and those of others at 1131 Alta Loma on March 9, 1974, it was sufficient.
 
 
 88
 Burston was present there while the heroin transfer took place. Officer Woempner testified that Burston entered the building, then returned outside while the suitcase of heroin was transferred from a car to the building. Burston and others appeared to serve as lookouts during the transfer. Burston entered the building again, accompanied by others who were apparently "guarding" the suitcase.
 
 
 89
 Burston contends that the fact that the evidence against him was supplied principally by Officer Woempner and that there were inconsistencies in his testimony requires reversal. But it is for the jury to determine the credibility of witnesses, resolve conflicts in evidence and draw reasonable inferences from the evidence. United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir. 1969). The jury could reasonably conclude on the basis of the evidence that Burston participated in the conspiracy.
 
 
 90
 The convictions of Wimbley and Sheppard are reversed and remanded. The convictions of all other defendants are affirmed.
 
 
 
 *
 Honorable William H. Orrick, Jr., United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Appellant also argues that the disclosure by the officers that Vernard Harris had been killed in a search by police shortly before Wimbley's arrest is another factor militating against the conclusion that the consent was voluntary. The record indicates to the contrary. Officer Myer, in charge of those who entered Wimbley's apartment, testified that the statement about Harris was not made until after consent to search had been received. It could not have affected the voluntariness of appellant's consent