UNITED STATES of America,
Plaintiff-Appellee,

v.

Raymond Abbay HACKETT,
Defendant-Appellant.

No. 79–1263.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 1980.

Decided Sept. 15, 1980.

Rehearing Denied Nov. 6, 1980.

Marcus S. Topel, Paul D. Wolf, San Francisco, Cal., for defendant-appellant.

Robert S. Mueller, III, Asst. U.S. Atty., San Francisco Cal., for plaintiff-appellee.

Before CHOY and GOODWIN, Circuit Judges, and SOLOMON,* District Judge.

CHOY, Circuit Judge:

Hackett was convicted of conspiracy to import cocaine and importation of cocaine in violation of 21 U.S.C. §§ 952 and 963. We affirm.

## I. STATEMENT OF FACTS

Customs agents discovered 58 pounds of cocaine hidden in the false bottom of a crate shipped from Santa Cruz, Bolivia, and addressed to I.K.I., Inc., San Francisco, a business owned and operated by Hackett. Agents of the Drug Enforcement Administration (DEA) removed the cocaine and substituted a look-alike, non-narcotic substance. The agents also inserted an electronic transmitter emitting a slow impulse which could be monitored over a radio. The transmitter was designed so that this impulse would accelerate greatly when the drug compartment was reopened.

DEA agents followed Hackett from the San Francisco airport where he picked up the crate, over the Golden Gate Bridge into Tiburon where he picked up an accomplice, Turner, and on to Hackett's residence a few blocks away where the crate was unloaded

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

into his garage. The transmitter began emitting the fast signal indicating the drug compartment had been opened, and after a few seconds went dead. The agents closed in. After demanding entry and receiving no response, agents entered the garage. They found the crate upside down with its bottom ripped open. The crate and the garage floor around it had been wetted down, presumably with a nearby garden hose. (The agents surmised that this had been done to short circuit the transmitter.) Hackett and Turner, the electronic transmitter and the contents of the drug compartment were gone.

A short time later, Turner was spotted on the street in front of Hackett's residence. He was questioned and arrested. Hackett's girl friend arrived shortly and admitted agents into the house. Hackett was found hiding in an upstairs bathroom where he was arrested. A search warrant for Hackett's house was then obtained and evidence implicating Hackett in the drug conspiracy was discovered. The electronic transmitter and the other contents of the hidden compartment were never recovered.

Hackett was convicted after a jury trial and sentenced to 10 years in prison and fined $30,000. (Additional facts are included in the discussion below.)

## II. DISCUSSION

### A. Hackett's Warrantless Arrest

The district court denied Hackett's motions to suppress all evidence derived from the warrantless entry of the garage and Hackett's warrantless in-house arrest on the ground that exigent circumstances excused the agents from any warrant requirement.[1] Hackett's attack on this conclusion is three-pronged. First, he contends that when the transmitter indicated the drug compartment had been opened, immediate entry into the garage was not necessary to prevent destruction of evidence or escape of the suspects; the police had the area "secured," he says, and could have waited until

a warrant was procured before entering the garage to make the arrest. Second, he contends that even if exigent circumstances existed at that point, they were, insufficient to abrogate the warrant requirement because they were created by the agents' use of the controlled delivery procedure and failure to procure in advance an arrest warrant. Finally, Hackett maintains that even if the warrantless entry into the detached garage was justified, any exigency did not extend to his residence where he was arrested.

### 1. The entry into the garage

█ Agents observed Hackett and Turner unloading the cocaine crate into Hackett's garage. Approximately 5 to 10 minutes later, the transmitter began emitting the fast signal indicating the drug compartment had been opened; after 10 to 15 seconds the transmitter went dead. In less than 2 minutes, agents were outside Hackett's garage. The door was down but slightly ajar. The agents identified themselves, demanded entry, and upon hearing no response entered the garage and encountered the scene described above.

When Hackett and Turner opened the bottom of the crate to enter the drug compartment and discovered the transmitter, they realized that they were under surveillance and in imminent danger of arrest. Immediate action was necessary to prevent their escape and destruction of evidence. Hackett and Turner had in fact managed temporarily to escape and the transmitter and the contents of the drug compartment were permanently disposed of by the time the agents entered the garage only a few minutes later. Thus, exigent circumstances existed at the time of the agents' entry into the garage. *See United States v. McLaughlin*, 525 F.2d 517, 521 (9th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976); *United States v. Bustamante-Gamez*, 488 F.2d 4, 8–9 (9th

---

1. Because we agree with the district court's conclusion on the exigent-circumstances issue, we do not reach the issue whether *United States v. Prescott*, 581 F.2d 1343 (9th Cir.

1978), requiring warrants for in-house arrests absent exigent circumstances, applies retroactively to the pre-*Prescott* arrest of Hackett.

Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

    2. *The agents' creation of exigent circumstances*

■ In *United States v. Dubrofsky*, 581 F.2d 208 (9th Cir. 1978), we approved the warrantless use of a controlled delivery procedure almost identical to that used here. Thus, the procedure is not *per se* objectionable.[2]

■ Hackett contends, however, that the agents had several days' notice that Hackett would be picking up the crate at the airport and had probable cause to arrest him there, and that they also knew at least 20 to 30 minutes before his arrival that Hackett was "in all probability" destined for his residence. Thus, an in-house arrest was "foreseeable," argues Hackett, and any exigency existing at that time was created by the agents' own failure to procure a warrant in advance, or at least to arrange for the procurement of a telephonic warrant.

    In support of this argument, Hackett cites *United States v. Curran*, 498 F.2d 30, 34 (9th Cir. 1974), and *United States v. Calhoun*, 542 F.2d 1094, 1102 (9th Cir. 1976), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977).

    In *Curran*, officers received a reliable tip that a large quantity of marijuana was at a certain house and would be shipped out in small quantities. They staked out the house and stopped three cars that left, finding three kilograms of marijuana in one. Without a warrant, officers approached the house; when the door was opened, they smelled marijuana. They entered and discovered marijuana.

    The Government's exigency theory was that the officers approached the house simply to ask questions (for which no warrant is required); when the door was opened and the officers simultaneously smelled the marijuana and revealed their presence, it became necessary to enter immediately to prevent destruction of evidence.

    We found it clear, however, that the officers did not intend merely to ask questions but also to search for marijuana. Knowing that marijuana was present and knowing that they would make their presence known to the occupants, the officers consciously established the condition which the government now points to as an exigent circumstance. If exigency arises because of unreasonable and deliberate delay by officers, it is not an exigent circumstance capable of dispensing with the requirement of a warrant.
498 F.2d at 34.

    We went on, nonetheless, to justify the entire raid, including the approach to the door, on an exigency theory. There was every reason to believe that the marijuana was in the very process of being distributed. We held that even though it might have been possible to attempt to stop all cars leaving the house until a warrant to search the house was obtained, this would have been unreasonable and burdensome under the circumstances. Moreover, word of such a siege soon would have reached the house, and the evidence would then have been destroyed. *Id.* at 35.

    In *Calhoun*, DEA agents and local police officers had been investigating for many months members of a suspected drug importation ring. When they learned that a major drug transaction had taken place, they obtained and executed a search warrant for Calhoun's apartment. A shoot-out ensued in which the ring leader was killed and Calhoun wounded. A large quantity of heroin was discovered. About an hour later, other officers went to Sheppard's apartment to arrest him without a warrant. Sheppard was gone but evidence incriminating him was found in his apartment. 542 F.2d at 1102.

    The Government argued exigency to enter Sheppard's apartment, saying that Sheppard might have learned of the raid on Calhoun's apartment and attempted to flee. We held that though this was possible, "nothing in the record indicates it was more

---

**2.** As a three-judge panel we of course cannot, as Hackett urges us, overrule *Dubrofsky*.

likely here than in any other case where there are two or more suspects and all are not arrested at once." *Id.* And the ability of the officers to maintain surveillance while a warrant was sought "suggests that exigent circumstances did not exist." *Id.*

Here, on the other hand, it was necessary to effect the arrest as quickly as possible in order to catch the suspects in the act of opening the false bottom—thereby establishing their guilty knowledge of the drug compartment and its contents. Moreover, as the agents testified the situation of Hackett's house and garage on the heavily-wooded bayside bluff made it difficult if not impossible to surround and secure the residence, as we felt could have been done with Sheppard's apartment. This was demonstrated by the fact that Hackett and Turner did manage to elude the agents closing in on the garage. Turner made it all the way out onto the street, apparently having gone down a bluff trail to the bay and circling around. Thus, the exigency we doubted in *Calhoun* was clearly present here.

We also had great difficulty in *Calhoun* with the fact that an arrest warrant for Sheppard had not been sought when the agents obtained the search warrant for Calhoun's apartment even though Sheppard's arrest was then intended.

Finally, we note that the alleged exigency in this case was a foreseeable result of the search of Calhoun's apartment. Having decided not to seek additional warrants at the time they requested the warrant for Calhoun's apartment, they cannot rely on the foreseeable consequences of that decision as a justification for a warrantless entry of a residence in the nighttime to effect an arrest.

*Id.* at 1102–03.

The officers in *Calhoun* intended at the outset to arrest Sheppard at his residence. Here, the agents did not specifically intend either to arrest Hackett or to make an arrest at a residence. They were interested in arresting only whoever knew the cocaine was in the crate, *i. e.*, whoever was present when the secret compartment was opened.

Although the agents knew beforehand that Hackett would be picking up the crate, and that he was the owner of I.K.I., Inc., the addressee of the crate, Hackett may have been a mere dupe or mule for the true smugglers. And because the crate was addressed to I.K.I., Inc., and Hackett picked up the crate during business hours, it was natural to assume that Hackett would proceed to I.K.I., Inc. Agent Cox testified that it was not until after Hackett crossed the Golden Gate Bridge that he began to suspect Hackett was heading for his residence. From that point it took only 15 to 20 minutes to reach Hackett's residence; approximately 5 to 10 minutes later, the crate was opened. Thus, only 20 to 30 minutes elapsed between the agents' first "suspicions" that Hackett was going to his residence and the opening of the crate.

■ Hackett contends that this was long enough to procure a telephonic warrant. We disagree. Such a warrant cannot be procured merely by calling up a magistrate and asking for authorization. Fed.R. Crim.P. 41(c)(2) requires the following procedures:

.     .     .     .     .

(B) *Application.* The person who is requesting the warrant shall prepare a document to be known as a duplicate original warrant and shall read such duplicate original warrant, verbatim, to the Federal magistrate. The Federal magistrate shall enter, verbatim, what is so read to such magistrate on a document to be known as the original warrant. The Federal magistrate may direct that the warrant be modified.

(C) *Issuance.* If the Federal magistrate is satisfied that the circumstances are such as to make it reasonable to dispense with a written affidavit and that grounds for the application exist or that there is probable cause to believe that they exist, the Federal magistrate shall order the issuance of a warrant by directing the person requesting the warrant to sign the Federal magistrate's name on the duplicate original warrant. The Federal magistrate shall immediately sign

the original warrant and enter on the face of the original warrant the exact time when the warrant was ordered to be issued. The finding of probable cause for a warrant upon oral testimony may be based on the same kind of evidence as is sufficient for a warrant upon affidavit.

■ Even assuming the agents could have patched through to a telephone line from their car radio and contacted a magistrate, we doubt that the procedures mandated by Rule 41 could have been complied with in 20 minutes from a moving car. Moreover, it would not be reasonable to require agents even to attempt to do so while in pursuit of a moving suspect upon mere "suspicion" that the suspect is headed for his residence. Not until Hackett actually arrived and unloaded the crate into his garage did it become clear an arrest would take place there.

Hackett counters that Rule 41 could have been satisfied by pre-arranging for the telephonic availability of a magistrate and preparing a duplicate original warrant with only a few blanks left to be filled in as the information became available. This of course would have had to be done before Hackett arrived at the airport to pick up the crate. At that point there was absolutely nothing to suggest that an arrest at Hackett's residence might take place. To require here the procedure Hackett argues for would be to require it in every case where the merest possibility exists that a suspect might eventually end up at his residence. We are unwilling to impose such an unreasonable burden on the police.

The agents here did not "create" the exigent circumstances by unreasonable and deliberate delay in seeking a warrant.

### 3. *The entry into the house*

■ Hackett contends that whatever exigency existed to justify the warrantless entry into the garage had dissipated before the entry into the house, and that therefore the testimony regarding the circumstances of his arrest was inadmissible. We disagree.

Approximately 30 minutes elapsed between the agents' entry into the garage and their entry into the house. During this half hour, however, the agents were not idle. After entering the detached garage and finding that Hackett and Turner were gone, the agents searched outside the garage and then went to the front door of the house. They knocked, demanded entry, and determined that the front and back doors were locked. Because a large German shepherd dog was prowling inside the house, the agents did not immediately attempt to break in.

Just then, word came over their hand radios that other agents down at the yacht club parking lot were detaining a man thought to be Turner. Leaving one agent at the house, the other agents drove down to the yacht club where it was determined that the detained suspect was not Turner. On their drive back to the house, the agents spotted Turner walking up the street. Turner was stopped, questioned, and arrested. The agents then returned to the house.

Approximately 5 to 10 minutes later, Hackett's girl friend returned in the station wagon. The agents informed her of their purpose and persuaded her to unlock the front door and subdue the German shepherd.[3] Hackett eventually was found crouching behind a door in an upstairs bathroom where he was arrested.

The agents did not have the time or opportunity to seek a warrant, even telephonically, during this half hour. Hackett was still at large and the contraband from the drug compartment had not been recovered. The district court did not clearly err in finding that the agents acted reasonably in dealing with the intervening problems of Hackett's dog, Turner's arrest and the negotiations with Hackett's girl friend about entry into the house. *Cf. United States v.*

---

3. Because the agents indicated they would enter the house even without her assistance if necessary, and might be forced to shoot the dog guarding the inside of the house, the Government has never suggested the assistance of Hackett's girl friend constituted consent to enter the house.

*Gardner,* 627 F.2d 906, at 911 (9th Cir. 1980) (clearly erroneous standard applies to district court's finding that exigency justified warrantless search). We agree with the district court that the exigent circumstances had not dissipated during the interval between the entries into the garage and the house.

■ Furthermore, even were we to hold the entry into the house illegal, only the testimony about Hackett hiding in the bathroom would require suppression. No other evidence was seized until a search warrant had been obtained. We think the erroneous admission of this testimony would be harmless beyond a reasonable doubt. Although the prosecutor argued that Hackett's hiding behind the bathroom door implied consciousness of guilt, other evidence, clearly admissible, implied even more strongly Hackett's consciousness of guilt: *viz.,* his flight from the garage and disposal of the transmitter and the packages of what he thought to be cocaine.[4]

■ It is true the agents also recited the circumstances of Hackett's arrest in the affidavit supporting the application for the warrant to search the house. But this information can easily be disregarded without impairing the sufficiency of the affidavit. *Cf. Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2685–86, 57 L.Ed.2d 667 (1978) (deliberately or recklessly false statement in application for warrant does not invalidate warrant if, setting that statement aside, material sufficient to establish probable cause remains). Thus, it was not error to deny suppression of the evidence obtained through execution of this warrant.

B. *Hackett's Motions for Severance*

1. *Severance from Turner*

Before Turner was arrested in front of Hackett's residence, he stated in response to questioning that he had never been to Hackett's house and did not even know who

lived there. He also said he had just returned from the phone booth down the road at the yacht club. Agents who had been staked out at the yacht club knew this to be false.

■■■■ Hackett charges *Bruton* error in the admission of testimony about these false exculpatory statements, or in the district court's failure to sever trials so that Turner could be cross-examined.

*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), held that the admission in a joint trial of extrajudicial statements made by one codefendant that inculpate another codefendant could violate the confrontation clause when the declarant elects not to take the stand and is therefore unavailable for cross-examination. *See Dutton v. Evans,* 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970); *United States v. Snow,* 521 F.2d 730, 734 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). "The test, as restated by this court, is whether, 'under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declarations.'" *United States v. Snow,* 521 F.2d at 734, *quoting United States v. Adams,* 446 F.2d 681, 683 (9th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971).

Here, however, Turner's statements were admitted not for their truth, but merely for the fact that the statements were made. *See United States v. Fried,* 576 F.2d 787, 792–93 (9th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). Combined with other evidence showing Turner's statements to be false, the mere fact that Turner made them implied his consciousness of guilt. The agent who recounted Turner's statements was available for cross-examination on whether Turner in fact made them. Thus, cross-examination of Turner was not necessary to protect Hackett's con-

---

4. We do not agree that Hackett is entitled to the inference that Turner alone disposed of this evidence. That Hackett at least assisted in the disposal of all traces of 20 individual 2–3 pound packages in the less than two minutes it took the agents to enter the garage after the crate had been opened is certainly a permissible inference for the jury to have drawn.

frontation right on the question whether Turner in fact made the statements. *See Anderson v. United States,* 417 U.S. 211, 220–21, 94 S.Ct. 2253, 2260–61, 41 L.Ed.2d 20 (1974); *Dutton v. Evans,* 400 U.S. at 88, 91 S.Ct. at 219.

Furthermore, we do not agree that Turner's attempt to disassociate himself from Hackett implied an assertion by Turner of Hackett's guilt. Whatever tangential effect Turner's statements may have had on Hackett in the eyes of the jury, "we deem the connection between the statements and [Hackett's] culpability to be too remote to require reversal under *Bruton.*" *United States v. Brown,* 551 F.2d 639, 647 (5th Cir. 1977), *rev'd on other grounds,* 569 F.2d 236 (5th Cir. 1978) (en banc).

■■■ Finally, the district court was correct in refusing to limit the admission of Turner's statements to Turner alone. As we have already held, Turner's statements were not hearsay. *See United States v. Fried,* 586 F.2d at 793. Thus it was not necessary that they were in furtherance of the conspiracy in order to be admissible against the other defendants. *See Anderson v. United States,* 417 U.S. 211, 221, 94 S.Ct. 2253, 2261, 41 L.Ed.2d 20 (1974). "[Turner's statements were] accordingly admissible simply if relevant in some way to prove the conspiracy charged." *Id.; see Lutwak v. United States,* 344 U.S. 604, 617, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953).

By showing Turner's consciousness of guilt of his participation in the conspiracy, obviously these statements tend to establish the existence of the conspiracy. Thus, the statements were relevant and admissible against Hackett.

### 2. *Severance from Stanton*

■■ Co-conspirator Stanton, who packaged and shipped the cocaine from Bolivia,[5] attempted to negotiate a plea bargain with the prosecutors by making a tape-recorded statement describing his innocent involvement in the cocaine shipment. His preposterously improbable exculpation involved two mythical characters of the same name, one of whom was the "true" guilty party. Hackett was mentioned only in passing.

Stanton was unsuccessful in his negotiations with the prosecutors, but they agreed to keep Stanton's statement secret. The court, however, later ordered the statement disclosed to the defense as possible *Brady* material. Hackett immediately moved for severance from Stanton on the ground that if the statement were admitted, Hackett would be prejudiced merely by being associated with such a palpably fanciful story.

When the Government did not offer the statement, Hackett promptly moved for its admission on the ground that it exculpated him. Alternatively, Hackett moved for severance to take Stanton's "exculpatory" testimony. The statement was clearly inadmissible hearsay. It was not error to exclude it. Nor was it error to deny severance.

■■ Joint trials are favored for the reason of judicial economy, and a denial of severance is reversible only where it is so prejudicial that the district court could have exercised its discretion in only one way. *Parker v. United States,* 404 F.2d 1193, 1194 (9th Cir. 1968), *cert. denied,* 394 U.S 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969). "When the reason for severance is the asserted need for a codefendant's testimony, the defendant must show that he would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable to the moving defendant." *United States v. Vigil,* 561 F.2d 1316, 1317 (9th Cir. 1977) (per curiam). Here, Hackett does no more than baldly assert that he would call Stanton and that Stanton would testify at a separate trial. " 'The unsupported possibility that such testimony might be forthcoming does not make the denial of a motion for severance erroneous.' [Citation.]" *United States v. Bumatay,* 480 F.2d 1012, 1013 (9th Cir. 1973).

---

5. We affirmed Stanton's conviction for his involvement in the conspiracy in *United States v. Stanton,* 624 F.2d 195 (1980).

Moreover, there is no credible testimony that Stanton could give that would exculpate Hackett. Hackett contends that when Stanton gave his statement, Stanton was being offered leniency in return for his incrimination of Hackett and Turner. Even though Stanton's statement did not actually exculpate Hackett, Hackett suggests that the mere fact that Stanton failed to incriminate him in the face of the Government's offer is clearly exculpatory. But there is no evidence the Government offered such a deal to Stanton. Furthermore, Stanton's primary purpose was to exculpate himself, not to incriminate Hackett. He asserted a complete lack of knowledge of any criminal activity until after he heard of Hackett's and Turner's arrests. Stanton could not have incriminated Hackett and still claimed ignorance. The less mention made of Hackett, the better, for Stanton—it provided less opportunity to be controverted as to specific facts.

Moreover, Stanton's entire statement was inherently incredible. At best, any inferential exculpation of Hackett would have been insignificant in the face of all the uncontroverted evidence showing Hackett's guilt. At worst, as Hackett originally feared, associating himself at all with Stanton's statement would have been prejudicial.

It was not an abuse of discretion to deny Hackett's motions for severance.

## C. *Ex Parte Meetings*

When the defense moved under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for production of all evidence materially favorable to the defendants, the Government requested an *ex parte* meeting with the court to disclose the existence of Stanton's statement. The Government doubted the statement was *Brady* material because of its incredibility and informed the court of Stanton's request to keep his statement secret from the other defendants. This meeting was recorded by the court reporter.

The next day the court called the prosecutors into chambers and informed them that, though Stanton's statement was not discoverable under Fed.R.Crim.P. 16, just to be on the safe side it should be produced to the other defendants as potential *Brady* material. This meeting, which was not reported, lasted about 7 minutes. Copies of Stanton's statement were thereupon distributed to all counsel.

Although he does not cite any specific prejudice, Hackett contends his Sixth Amendment right to counsel and a hearing before a fair and impartial judge were denied.

In *Haller v. Robbins*, 409 F.2d 857 (1st Cir. 1969), the First Circuit held that a prosecutor's *ex parte* communication of prejudicial information to the trial court was reversible error. The court stated that not every *ex parte* communication would require reversal, but "the burden of proving lack of prejudice is on the [prosecution], and it is a heavy one." *Id.* at 860.

Here, the transcript of the first meeting proves that nothing improper or prejudicial took place. Although the second meeting was not recorded, both the judge and the prosecutor gave accounts fully explaining what transpired in the meeting. Both accounts show no prejudice to Hackett. In fact, the court ruled against the Government and required production. Even in the absence of a transcript of the second meeting, the burden of showing no prejudice has been met here.

## III. CONCLUSION

It was not error to admit the evidence derived from the agents' warrantless entry of the garage and from Hackett's warrantless arrest. The denial of severance was proper. The *ex parte* meetings did not prejudice Hackett. Hackett's conviction is

AFFIRMED.